E-FILED
Tuesday, 21 March, 2023  03:47:01 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | | |
|---|---|---|
| **LUCINDA PARSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 21-CV-2119** |
| | ) | |
| **CITY OF DANVILLE, RICKEY WILLIAMS,** | ) | |
| **JR., SANDRA FINCH, and CARL** | ) | |
| **CARPENTER,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>ORDER</u>

Plaintiff, Lucinda Parson, brought this claim against Defendants City of Danville, Rickey Williams, Jr., Sandra Finch, and Carl Carpenter, alleging violations of Plaintiff's rights under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.), the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution pursuant to 42 U.S.C. § 1983, the Age Discrimination in Employment Act (29 U.S.C. § 621 et seq.) ("ADEA"), and the Illinois Human Rights Act (775 Ill. Comp. Stat. 5/1-101 et seq.) ("IHRA").  Defendants filed a Motion for Summary Judgment (#29) on August 19, 2022, to which Plaintiff filed a Response (#33) on September 6, 2022.  Defendants filed their Reply (#35) on September 21, 2022.  The Motion is now fully briefed and ready for the court's decision.

BACKGROUND

The following background facts are taken from Defendants' Statement of Undisputed Material Facts, Plaintiff's Additional Facts section in her Response, and the exhibits attached by the parties to their filings.  The court will only consider those facts properly before it.

*General Background of Parties and Plaintiff's Employment with the City of Danville*

<u>Overview</u>

Plaintiff, who had served as the City of Danville's superintendent of recreation, alleges that Defendants discriminated against her on the basis of her race, gender, sexual orientation, and age when she was suspended without pay and her position with the City of Danville ("the City") was eliminated in late 2020.  She also alleges Defendants impermissibly retaliated against her for her participation in an investigation into whether she discriminated against, properly disciplined, and/or retaliated against a subordinate.

<u>The Parties</u>

Plaintiff was born in 1966 and is a 55-year old white female.  She is a lesbian. Plaintiff was hired by the City of Danville in 1990 as the secretary to recreation.  In 1995 she was promoted to recreation assistant.  In 2002 she was promoted to recreation manager and the position was later changed to superintendent of recreation.  She never hid her homosexuality while at work, and believes it was commonly known in Danville that she was gay in 2016, when she married her wife, Susan Anglum, who had been a laborer for the City.  Defendant Williams has known since he was a child that Plaintiff was a lesbian and he knew Plaintiff's wife as a City employee.

2

Williams is a multiracial heterosexual male born in 1978, who has black, white, and Native American ancestry.  He served as an alderman for the City from May 2009 to May 2019, and became the interim mayor on November 6, 2018.  He was elected mayor in his own right in April 2019.

Defendant Carpenter is a white heterosexual male born in 1961.  Carpenter became the interim director of public works in November 2018, and then the full-time director of public works in May 2019.  He was Plaintiff's supervisor at the time of the elimination of her position.

Defendant Finch is a black heterosexual female born in 1959.  She has been the human relations administrator for the past 32 years and is the person responsible for handling investigations of discrimination or harassment.

<u>Plaintiff's Job Duties</u>

Plaintiff's job description identified her job duties.  She oversaw recreation programs and activities which consisted of ten programs: (1) the two-day Christmas Craft Show; (2) the three-day Vermilion River Fall Festival; (3) the annual Golden Wedding Celebration; (4) Easter Egg Hunts; summer and fall (5) softball and (6) kickball leagues; and handling field and facility maintenance for the (7) spring high school and (8) junior college baseball and (9) junior college softball teams, as well as (10) the municipal pool.  In addition to the department programs, Plaintiff was also responsible for downtown parking, park maintenance, unoccupied buildings, and city corridors.

Plaintiff hired and supervised 28 seasonal employees who worked at the parks, maintenance, city corridors, unoccupied buildings, restrooms, and the municipal pool, plus three seasonal employees who worked throughout the year (two in downtown parking, and one at the Harrison Park Clubhouse).

Plaintiff stated, in her declaration, that her specific assigned job duties and responsibilities "evolved" over time. Plaintiff declared that, based on her assigned duties and responsibilities, she filled a full-time role for the City and was not a seasonal employee.

*Plaintiff's 10-Day Suspension Over the Lisa Murphy Investigation*

In April 2019, Williams issued a directive to City department heads, including Carpenter, stating that "due to unfortunate incidents of [the] recent past, all disciplinary actions must be approved by me before being administered." Department heads were asked to "convey these directives to your staff." Carpenter replied to the email stating "[u]nderstood and will comply." The directive was issued in response to a discrimination suit that had recently been filed by former City employee Lisa Robinson.

On July 8, 2020, emails were exchanged between Williams, Danville Police Chief Yates, Carpenter, and Plaintiff regarding a change in the policy that, until that time, required anyone who entered the municipal pool to show identification ("ID"). Williams wrote "I believe we need to give it a few days with the no ID policy to see how things go. I understand the reasons for the ID requirement, but I cannot say that I agree with the ID policy." Plaintiff then met with the pool cashiers and managers about Williams' decision not to check IDs.

4

Sometime later, Plaintiff made the decision to reinstate checking the IDs at the pool and testified that she verbally informed Carpenter of the change, and that he was aware she was going to start checking IDs again.  Plaintiff testified that Carpenter told her, in response, that if there was an issue and someone did not have identification on them, Plaintiff was to "ask for their name and IDs," which would include their "name and telephone numbers or addresses."  Defendants dispute Plaintiff's assertion, noting that at the September 9, 2020, interview with Finch, Plaintiff told Finch she got the directive from Carpenter to stop checking IDs, but never told her staff about it and they continued to check IDs at the pool.  At the same interview, however, Carpenter told Finch "I told [Plaintiff] that we should probably stop asking for [IDs], or if we ask for them and they do not have one then just ask them for their name and address, so we have a record of who is inside the pool."  Carpenter then confirmed to Finch that he was aware of the fact that Plaintiff and the pool employees went back to asking for IDs.

One of the assistant managers at the pool in 2020 was Lisa Murphy, a 40-year old heterosexual black female.  Plaintiff interviewed and hired Murphy as an assistant pool manager in May 2020.  Carpenter signed off on Plaintiff's hiring of Murphy.  In addition to her work as an assistant manager at the pool, Plaintiff sometimes assigned Murphy to fill in at downtown parking "when she could."

Before August 5, 2020, Murphy communicated directly with Williams, and had contacted him in 2019 about "issues she was having with the [C]ity."  In 2020, she emailed Williams seeking resources to help her with "DCFS and reporting." She also

communicated directly with Finch, seeking help for her children, and Finch referred her to an organization that provided "clothing and stuff."  Plaintiff was aware of the ongoing problems in Murphy's personal life.

The City kept Murphy's timesheets of her work, and Plaintiff copied the timesheets and wrote notes on the side.[1]  Plaintiff wrote on Murphy's timesheets that on August 4, 2020, Murphy texted Plaintiff "I'm not going to quit, but I think the pool job is pretty much over for me this season.  Just being honest.  Been too much drama and messiness."

Plaintiff did not know what Murphy meant and denied that she had any problems with Murphy at that point.  Plaintiff then wrote on the timesheets that on August 5, 2020, Murphy was going to City Hall to speak with Finch; Plaintiff claims that she did not know why Murphy wanted to meet with Finch and she did not speak to Murphy.

On August 5, 2020, at 8:56 am, Murphy made a complaint against Plaintiff, telling Finch that Plaintiff said she was not going to listen to Williams' directive not to check IDs at the pool and that Plaintiff hoped that someone would run against Williams for mayor so that Williams would be out of office.[2]

---

[1]Some of the notes made by Plaintiff were made at the time the timesheets were turned in, and others were added later to help Finch with her investigations.

[2]Some of the allegations in the complaint made by Murphy against Plaintiff were determined to be unfounded, while others were sustained.  When asked at his deposition whether he understood the complaint made by Murphy to be "unfounded," Williams testified that "I disagree but yes, I understand that was the ruling.  I would contest it if there were an option to do so."

Murphy also complained to Finch of racial problems at the pool and that Plaintiff had discriminated against her based on race.  Plaintiff denies telling Murphy that they were not going to listen to Williams' directive on IDs.

Plaintiff wrote on Murphy's timesheet that Murphy met with Carpenter on August 6, 2020, Plaintiff knew the meeting was about her, and that Murphy started directly answering to Carpenter after her August 6 meeting with him.

At 11:00 am on August 11, 2020, Plaintiff disciplined Murphy by attempting to give her "written coaching."  Plaintiff testified that she would have needed Carpenter's approval before disciplining an employee.  Carpenter testified that he did not consider a written coaching session to be discipline.  Carpenter further testified that he knew in advance that Plaintiff was going to give Murphy written coaching, and he confirmed it was consistent with what he expected from Plaintiff.  He did not inform Williams that Plaintiff was going to issue the written coaching to Murphy before it was administered. Carpenter testified that he was not disciplined for allowing Plaintiff to coach Murphy without Williams' approval.  Carpenter believed that he did not need Williams' approval before allowing Plaintiff to give Murphy written coaching because a coaching session is not discipline.

Finch testified that she was aware that Plaintiff had attempted to give Murphy coaching after talking with Carpenter, and, when asked if she understood that Carpenter agreed with giving Murphy the coaching, testified that "my understanding is that [Carpenter] told her okay."

Following the coaching session, Murphy filed a retaliation complaint with Finch claiming that she was disciplined unjustly by Plaintiff.  At 4:17 pm that same day, August 11, 2020, Finch emailed Plaintiff and Carpenter notifying them that Murphy had filed a retaliation complaint against Plaintiff.  Plaintiff denied having any knowledge of Murphy's original August 5 complaint against her until she received and read the email from Finch.  Carpenter testified that Finch's August 11 email was the first time he learned that Murphy had filed a complaint against Plaintiff on August 5, and that he had no reason to believe that Plaintiff was aware of Murphy's August 5 complaint when she attempted to give Murphy the written coaching.

The Murphy investigation was the first time that Plaintiff had dealings with Finch.  On August 14, 2020, Plaintiff and Carpenter met with Finch as part of Finch's investigation, but the tape recorder did not work, so there is no transcription of the meeting.  Plaintiff claims that, at this meeting, Finch raised her voice at her and that Finch's demeanor was very hostile.

On September 9, 2020, Plaintiff and Carpenter met for a second time with Finch and a recording was made of the interview, during which Finch claims Plaintiff admitted to Finch that she became aware of Murphy's August 5 complaint against her when Murphy met with Carpenter on August 6.[3]  Plaintiff assumed the meeting was

_____

[3]An examination of the transcript of the September 9, 2020, interview, shows that Finch asked Plaintiff if she was aware that Murphy's meeting with Carpenter was "basically" about Plaintiff, to which Plaintiff responded "yes."  However, the cited transcript does not include any direct admission from Plaintiff that she was actually aware of Murphy's *August 5 complaint* to Finch before Plaintiff attempted to give Murphy coaching, just that she was aware before August 11 that Murphy had met with Carpenter on August 6, and that the meeting concerned her (Plaintiff).  See (#30, at p. 59 (DANVILLE- 89)).  There is evidence that Plaintiff knew Murphy had met with Finch on

about Plaintiff and Plaintiff assumed Murphy had an issue at the pool.  Carpenter testified that, during this second interview, Plaintiff admitted that employees were still checking IDs at the pool after he had told Plaintiff not to based on Williams' directive.

Also on September 9, 2020, Finch interviewed Carpenter alone.  During the interview, in discussing the written coaching Plaintiff gave to Murphy, Finch stated "after the write up it gave the appearance of retaliation, so that closed the door right there for me to do anything."  Finch further stated that "there wasn't very much against [Plaintiff].  And if she had not given her that write up, we wouldn't be sitting here right now."

Following one of the interviews (it is not clear from the cited deposition testimony whether it was the August 14 or September 9 interview), Carpenter told Plaintiff he thought Murphy's allegations were "BS" because he knew Murphy was missing work and leaving work early, and he knew that Plaintiff had verbally addressed it with Murphy.  Carpenter testified that he believed the allegations were a quick way for Murphy "to try to make some money."

Plaintiff testified that, before she was interviewed by Finch, Carpenter told her to be careful because Finch "has a tendency to be prejudiced."  Plaintiff testified that, after her first interview on August 14, 2020, Carpenter expressed concern that Finch believed Plaintiff was "guilty" and was "hostile" towards Plaintiff during the interview. According to Plaintiff, Carpenter communicated his belief that Finch's hostility was grounded in discrimination by rubbing his arm, indicating to Plaintiff that it was

---

August 5, but no direct evidence that Plaintiff was aware Murphy had filed an actual complaint, including a charge of discrimination, with Finch against Plaintiff.

because Plaintiff was "white." Plaintiff testified that she asked Carpenter "because of my skin color?" and Carpenter responded "Yes."

Carpenter denied that, after the first interview, he told Plaintiff he thought Finch was hostile towards Plaintiff because of Plaintiff's race. He testified that he remembered that there was "a lot of contention" during the interviews, and that Plaintiff was upset because Finch "would ask a question, [Plaintiff] would answer it, and [Finch] would ask the same question again." Carpenter stated that Finch was upset because she "disliked the answer that [Plaintiff] was giving her." He further testified that the second interview was "probably more contentious" than the first interview.

Following her investigation into Murphy's complaint, Finch completed an investigative report finding that Plaintiff committed three violations: insubordination, failing in her duties as a supervisor, and retaliation. Finch recommended a five-day suspension, which was increased to ten days after speaking with Williams. Finch also determined that a number of Murphy's allegations against Plaintiff were unfounded or not sustained, including the racial discrimination claims. In the report, Finch found that, as of August 6, 2020, Plaintiff admitted that she was aware of the initial complaint that Murphy had filed against her. Plaintiff denies making that admission to Finch.

Carpenter testified that, while he did not personally believe that Plaintiff had retaliated against Murphy, he believed that it was appropriate to discipline Plaintiff due to the findings of Finch's investigation.[4]

_____

[4]Carpenter had his own issues with Murphy. In late August 2020, Carpenter wanted to terminate Murphy, but instead placed her on administrative leave. Murphy then filed a separate complaint against Carpenter. Williams testified that Carpenter did not ask his permission before placing Murphy on administrative leave, and Williams never disciplined Carpenter for this. Finch testified that she never recommended

On October 23, 2020, Carpenter met with Williams and stated that he did not believe a ten-day suspension was warranted.  Carpenter recommended a five-day suspension, but Williams, as mayor, felt a ten-day suspension was appropriate. Carpenter did believe that Plaintiff had "somewhat" disobeyed his order not to check IDs at the pool.

On November 3, 2020, Carpenter gave Plaintiff a ten-day suspension without pay due to her failure to carry out the directive not to check IDs of persons at the pool, for not issuing corrective discipline against Murphy for her repeated tardiness, call offs, failure to show, and leaving her job site, and for retaliating against Murphy with the coaching session after Murphy filed the complaint against her.  Finch testified that she participated in the decision to coach counsel and discipline Plaintiff.

<u>Comparators to Plaintiff on Discipline</u>

Finch conducted investigations of discrimination complaints at the City for 32 years, and in the last five years she recommended discipline for five employees following her internal investigations: David Schnelle, department head and city engineer, a 58-year old heterosexual white male; Danville Mass Transit supervisor Robert McNeil, a 68-year old heterosexual black male; city inspector and code enforcement officer Rick Brown, a 64-year old heterosexual white male; former superintendent of streets Bob Scott, a 65-year old heterosexual white male; and community development department manager Chris Milliken, a 41-year old heterosexual white male.[5]

discipline for Carpenter.

[5]Plaintiff objects to the evidence in this paragraph on relevance and "improper character evidence grounds."  Concerning relevance, the court refers to its statement above in footnote 2.  Concerning "improper character evidence" under Federal Rule of

Williams also approved discipline for Tyson Terhune, a 48-year old heterosexual white male, who worked as the senior planner in public works as well as an employee in mass transit. The discipline was a five-day suspension due to an allegation of misconduct. Williams later eliminated Terhune's position.

*The Elimination of Plaintiff's Employment Position*

Plaintiff's Job Performance

Former Danville Mayor Scott Eisenhauer supervised Plaintiff for 15 years before he stepped down as mayor in 2018, and stated that she was an excellent employee who "constantly met or exceeded expectations with respect to the performance of her job duties." Former public works director Doug Ahrens supervised Plaintiff for many years and echoed Eisenhauer's sentiments.

Both Eisenhauer and Ahrens declared that Plaintiff's specific job duties evolved significantly over time. They also stated that, based on her assigned duties and responsibilities, Plaintiff fulfilled a full-time role for the City and was not a seasonal employee. Robert D. Schnelle, the City's director of community development until May 2019, declared that Plaintiff was a full-time employee, not a seasonal one.

Ahrens stated that Plaintiff successfully ran the City's recreation projects that consistently brought in revenue through the solicitation of sponsors to cover the expenses of the project and generate additional revenue for the City. He stated that her work on downtown parking generated additional revenue to the City in an amount that

---

Evidence 404(a)(1), the court does not find the objection applicable. Rule 404(a)(1) bars the use of evidence of a person's character or character trait to prove that on a particular occasion, the person acted in accordance with a particular trait. The fact that Finch, in her position as human relations administrator responsible for handling investigations of discrimination or harassment, handled investigations of discrimination or harassment *other* than that of Plaintiff, is not something that would fall under Rule 404(a)(1)'s ambit. The objection is overruled on that ground.

was equivalent to approximately 50% of Plaintiff's salary.

Concerning her overall job performance, Plaintiff's direct supervisor Carpenter never gave Plaintiff any written coaching or discipline prior to her job being eliminated on November 3, 2020, nor was Plaintiff told that there was not enough work for her to perform or that her position should be eliminated.

<u>Carpenter and Williams' Knowledge of Plaintiff's Job Duties</u>

Carpenter further testified that, since he became interim director in 2018, he was not familiar with how Plaintiff had been assigned the duties and responsibilities she had before he became her supervisor.  When asked how, when he first became interim director, he determined Plaintiff's job duties and responsibilities, Carpenter testified that he met with Plaintiff once and conferred with her.  He did not typically see Plaintiff on a daily basis, and the only way he knew what work she was doing at any given time was to actually see her at work or call or text her.

Apart from general budgetary concerns, Carpenter testified that he could not identify a particular aspect of the budget between 2018 and 2020 that was concerning him and could not identify a particular recreation activity that gave him concern.[6] Carpenter testified that he decided that Plaintiff's job was not full-time because in the winter months she allegedly was not making plans "and just kind of sat around most of the time." He never documented that he saw Plaintiff sitting around and doing no work.

---

[6]Williams testified that the budgetary concerns were raised by himself, not Carpenter.

Carpenter did not recall telling Plaintiff that he was having discussions with Williams regarding whether her position was full-time. Carpenter could not explain why he did not discuss the matter with Plaintiff.

Williams testified that it was a "joint decision" between himself and Carpenter to eliminate Plaintiff's position. Williams testified that he did not meet with anyone other than Carpenter regarding the work Plaintiff was performing, and that Carpenter was his only source of information about Plaintiff's work. Williams never met with Plaintiff about her job duties apart from one occasion which lasted 30 minutes, where he and Plaintiff discussed additional parking lot leases.

Williams testified that he communicated twice with Carpenter about Plaintiff's job duties or responsibilities, once in the winter of 2019 and once shortly before they decided to eliminate her position.[7] According to Williams, in discussing Plaintiff's job duties with Carpenter, "[i]t seemed to us that most of the year the job was not full-time. Not even close to full-time, actually."

Williams did not conduct a study or analysis to confirm or corroborate whether Plaintiff's job was full-time, did not ask the information technology department to review Plaintiff's work files to make an assessment of when she was working and what she was working on, and did not ask Carpenter if there were any documents that explained or described Plaintiff's job duties. Williams never talked with Plaintiff about the subjects he discussed with Carpenter and whether her work was full-time.

---

[7]As the below facts indicate in the "Position Elimination" section, Williams and Carpenter may actually have met three times about eliminating Plaintiff's position.

Williams did testify that at some point before the elimination of Plaintiff's position, Carpenter had her prepare a list of her responsibilities. According to Williams, the list Plaintiff prepared "included a bunch of extraneous things that she does that are dear to her but are not her City responsibilities in any way, and she included things that were not her City responsibilities and other people actually did and the things she did, again, were only seasonally busy." Plaintiff denies that she was ever asked to compile such a list. Williams could not identify the list in the exhibits at his deposition, and Defendants later confirmed that they could not find the list.

Position Elimination

In late 2018 or early 2019, Carpenter met with Williams to discuss eliminating the superintendent of recreation position because they questioned whether it was a year-round position, and because the City had implemented a spending freeze after determining the City was $900,000 short in required reserves.[8] Carpenter told Williams that they needed to evaluate the position for at least a year longer. Plaintiff disputes this, and testified that Carpenter told her he did not know of any plans to eliminate her position until it was announced.

On June 3, 2019, Williams emailed Carpenter, stating: "[Plaintiff] makes a substantial amount of money for what she does, especially in comparison to other people who make a similar amount or much less. It was my understanding prior to the recent overtime request that I received that she would not be paid any overtime this year and that is how we were saving her job! I am not authorizing her to be paid

---

[8]The City's auditor report for the fiscal year ending April 30, 2019, stated that the general fund cash reserved at the end of the fiscal year 2019 was $1,567,757, which exceeded the minimum requirement. The Danville City Council minutes for May 5, 2020, state that the City "ended Fiscal Year 2020 with over $4 million dollars in reserves up from only $300,000.00 in reserves in November 2018."

additional overtime in any capacity, so if we need to adjust her hours or whatever else we have to do, then that's what we need to do, but there is no way we are paying her for any further OT after what has been accumulated through today.  No one who functions in capacity as a division or department head should be receiving OT in my opinion, but especially not this position."  After that email Carpenter spoke with Plaintiff who converted her overtime to compensatory time.

In the winter of 2019-2020, Carpenter and Williams again discussed eliminating Plaintiff's position.  Carpenter told Williams that from what he was seeing, it was not a full-time position because during the winter months there was not a lot for Plaintiff to be doing, and there was no planning that he was aware of for the next season.[9] Carpenter also believed Plaintiff was taking her comp time or was sitting around most of the time.  Williams never told Plaintiff that he was reassessing her position because he wanted to determine whether the position was full-time based on her natural work environment.

On October 23, 2020, Carpenter and Williams met for a third time to discuss whether to eliminate the position of superintendent of recreation.  They agreed that it made sense to eliminate the position since, due to the COVID-19 pandemic, the only thing to do at the time was downtown parking, and there were not going to be any sports leagues and the city pool would likely be closed.[10]

_____

[9]Plaintiff, former Mayor Scott Eisenhauer, Ahrens, and Schnelle all stated that, in their time with the City, no one ever suggested Plaintiff's position was only a seasonal position, was not a full-time position, or should be eliminated.

[10]Defendant Finch played no role in the decision to eliminate Plaintiff's position. Plaintiff disputes this, because Finch's report was discussed at the same October 23, 2020, meeting where eliminating Plaintiff's position was discussed, but this is not evidence that Finch had any role in eliminating Plaintiff's position.

Carpenter testified that it was a "mutual decision" between himself and Williams to eliminate Plaintiff's position.

On November 3, 2020, Carpenter gave Plaintiff a letter notifying her that her position as superintendent of recreation was being eliminated.

City of Danville Alderman R.J. Davis, in his declaration, stated that he communicated with Plaintiff on November 3, 2020, after she received Carpenter's letter. According to Davis, before he communicated with Plaintiff, he "did not know her job was being eliminated" and he was "unaware of budgetary cuts under consideration involving the pool or the recreation division." Davis stated that, based on his 20 years of experience working for and with Danville City government, "[a]s an Alderman on the Danville City Council, and based on my experience with standard City of Danville practices, I would have expected to hear about job eliminations or budgetary cuts involving the pool or the recreation division before the mayor took action on such matters."

Defendants note that there is no evidence Williams spoke to any alderman before making his decision, or that he was required to. Former Mayor Eisenhauer stated that, when positions needed to be eliminated, the general process the City used included basic steps such as reviewing the position's job description and assigned tasks, conducting a time management study to assess the time required to fill the position's job duties, evaluating how the position's elimination would impact the essential tasks that needed to be performed, identifying who would be taking over the job duties, and conferring with the department head to analyze the preceding factors. According to Eisenhauer the City comptroller should also be conferred with to determine if the elimination of the position would result in the loss of services to City residents.

17

Williams testified that he announced at a Danville City Council meeting that he had eliminated Plaintiff's job. Davis attended the December 1, 2020, City Council meeting. Davis stated that, at the meeting, he and other members of the City Council questioned Williams about Plaintiff's suspension and position elimination. According to Davis, "concerns were raised by myself and others about whether Mayor Williams was eliminating [Plaintiff's] job for personal reasons and that the circumstances would turn into another 'Lisa Robinson case,' referring to the lawsuit brought by a former employee that was recently settled by the City of Danville." Davis further stated that when Vice Mayor Bob Iverson asked Williams whether there was a paper trail which would turn into a "Robinson ordeal," Williams stated in response that "everything was taken care of" and "there was no paper trail."

Williams testified that he did not recall whether questions were raised about whether or not his decision to eliminate Plaintiff's job would result in a dispute, and denied stating that he took care of everything and that "there was no paper trail."

<u>What Happened to Plaintiff's Job Duties After Her Position was Eliminated</u>

Since Plaintiff's position was eliminated, the pool has not opened and is not expected to open until Memorial Day weekend 2024. The municipal pool had previously been open from Memorial Day to Labor Day. Plaintiff hired approximately 20 people to work at the pool each year and she tried to go out to the pool at least once a day while it was open. In September or October 2020, Williams and Carpenter made the decision to not open the pool in 2021 due to a study showing that the pool was in bad shape and due to the COVID-19 pandemic.[11] Carpenter testified that the

---

[11]Former Mayor Eisenhauer declared that the Village of Rantoul and many other municipalities in Illinois continued to operate their pools and recreational activities during the pandemic by following established COVID-19 health precautions

engineering evaluation for the pool did not provide an opinion that the pool was not operational or indicate it should not be opened.  However, after receiving the evaluation, he did conduct a walk around of the pool and found various other things wrong, such as the guttering being in such extremely poor shape, suggesting to him that the pool was not safe.

There are also no longer any softball leagues or recreational activities in the public works department because of COVID-19.  The Golden Wedding Celebration and Easter Egg Hunt last took place in 2019, and due to COVID-19, there was no Christmas Craft Show or Vermilion River Fall Festival in 2020.

There is no one at the City who fills the position once held by Plaintiff and there is no longer a recreation division in the public works department.  There are no longer any seasonal employees.

Plaintiff declared that her responsibilities also included promotional materials for municipal recreational events including on the radio, newspaper, and social media, after social media became a popular way to communicate with the community.  In early 2021, the City created a new position of community relations administrator and ultimately hired Ashton Greer, a 31-year old heterosexual white female, for the position.

---

implemented by the Illinois Department of Public Health.

Greer took over two of Plaintiff's job duties: the Vermilion River Fall Festival and the Christmas Craft Show, as well as changing the City's website and Facebook page relating information on parks and recreation.  Those job duties are the only ones that overlap between Greer's position and Plaintiff's former job.

Williams testified that the creation of the new community relations administrator position was "critical," because the City needed to better communicate with constituents, needed to have a "huge increase" in the amount and frequency of activities provided to the community, and needed someone to work with neighborhood associations.  Williams also said the City needed a strong social media presence, and to better communicate with people in terms of providing them with information in a timely and professional manner, such as in press releases.  Williams never met with Plaintiff to discuss these issues.

Plaintiff shared responsibility for facility rentals with Terra Deneau, the program support specialist, and Steve Lane, the parks and property manager.  Plaintiff identified Lane, a white heterosexual male, as a comparator.  Lane has worked for the City as parks and public property manager since 1998, overseeing the daily operations of all parks and all City public properties.

Plaintiff's job responsibilities also included creating, evaluating, promoting, and overseeing "all activities necessary to initiate new programs, events, idea generation, and analysis of potential programs."  In 2019, at the request of Carpenter, Plaintiff implemented the downtown parking program, which was year-round other than the six weeks leading up to Christmas.

After Plaintiff's position was eliminated, Lane took over the Harrison Park Clubhouse operations, spending 30 minutes a week there throughout the year. Lane also took over downtown parking for up to one hour each week throughout the year, as well as city corridors and general park maintenance, which takes 90 minutes per week from April to November. General park maintenance was a task that Lane performed for 22 years before Plaintiff handled it from 2019 to 2020, after which the duties were returned to him following the elimination of Plaintiff's position.

Plaintiff's job duties also included "oversee[ing] recordkeeping and the timely execution of financial requirements." Plaintiff made the billings for pool parties, pool entrance, softball field rentals, shelters, Vermilion bandshell rental; collected the billings; and gave the money she collected to the city treasurer. Plaintiff managed office functions and documents for the division of recreation, which included ordering supplies when needed and handling contracts or lease agreements for recreational facilities.

Lane, in his declaration, declared that he now manages concession stand leases from April to November for less than 30 minutes each week, handles maintenance of softball fields for Danville Area Community College for less than 30 minutes each week for three months a year, and he assists with no more than six minor league baseball games per year that are part of AMBUCS, an entity separate from Danville, for a total of three hours a year. Carpenter now handles contracts.

<u>Other Potential Comparators On the Issue of Position Elimination</u>

Plaintiff is not the only City employee who has had their position eliminated in recent years.  In February 2019, at the recommendation of Carpenter, Williams eliminated the position of deputy director of public works, which was held by Ray Garcia, a 38-year old heterosexual Hispanic male, and those duties have been assumed by Carpenter.

In the mid- to late-spring of 2019, David Schnelle, a 58-year old white heterosexual male who was the city engineer and director of urban services, resigned while Williams was preparing to terminate him for failure to perform duties, including failure to properly supervise and discipline employees and gross insubordination, among other reasons.  Schnelle stated in his declaration that he voluntarily resigned and was never informed that he had failed to perform his duties or that he engaged in insubordination of any kind.  Williams testified that he never told Schnelle he was going to be terminated.

Williams also eliminated one of the code enforcement inspector positions and let go the union employee with the least seniority, Don Crews, a 40-year old heterosexual white male.

Williams also eliminated the position of program support specialist-finance, held by Joe Sweeney, a 45-year old heterosexual white male.  The City had previously had a department head who identified as gay and a public works employee who identified as a lesbian.

Plaintiff's November 3, 2020, Interaction with Carpenter Following Notice of
<u>Suspension and Job Elimination</u>

Plaintiff testified that on November 3, 2020, after she was given the letters
notifying her of her suspension and that her job was eliminated, she came back to
Danville public works with her wife and asked Carpenter if he agreed with the ten-day
suspension, to which Carpenter allegedly replied "no."  Plaintiff testified that she asked
Carpenter if there had been any previous discussions of eliminating any positions, and
Carpenter allegedly stated no.  Plaintiff testified that, when she asked Carpenter why he
would sign the letters if he did not agree with them, Carpenter "shook his head" and
there was "no verbal response."  Plaintiff testified that she understood Carpenter's non-
verbal response to mean "basically he's done all he could" and "he was sorry."

Anglum's testimony supports that of Plaintiff.  In addition, Anglum testified that
Plaintiff told Carpenter "Finch told me I had to file a grievance against you because you
signed the letters[,]" to which Carpenter responded "So that's how they are going to
play it."

Carpenter denied telling Plaintiff that he disagreed with the suspension and he
denied telling Plaintiff that he had no idea that her position was being eliminated.
Carpenter denied telling Plaintiff that he had had no prior discussions with Williams
about eliminating her position.  Rather, Carpenter testified that Plaintiff "confronted"
him and "said something about she'd been up to see [Finch] and they said this was all
my idea and she continued to carry on.  And I just told her I wasn't going to discuss it
with her and walked away."

On November 5, 2020, Plaintiff filed a grievance regarding her suspension.  The grievance ultimately went to arbitration, where the arbitrator changed the suspension to a written reprimand, resulting in Plaintiff receiving back pay for the ten-day suspension.[12]

<u>Plaintiff's Evidence of Discrimination/Retaliation</u>

Plaintiff was not able to identify evidence that her position was eliminated because of her protected class or in retaliation for her participation in Finch's investigation of Murphy's complaint.  During her employment, no one at the City made any negative comments about Plaintiff's sexuality.

Plaintiff felt that Williams was hostile to her because of her sexuality because he is a religious man and he never reached out to her to ask about her job when he took office as mayor.  Plaintiff also felt that Williams discriminated against her because he participated in the Murphy internal investigation when he allegedly knew that

---

[12]Plaintiff challenges the admissibility of the arbitrator's findings on hearsay grounds pursuant to Federal Rules of Evidence 801 and 802.  "[T]he admissibility of an arbitral decision is within the discretion of the district court; the court may either admit or exclude the decision based on the circumstances of the case."  *Stimeling v. Board of Education of Peoria Public Schools Dist. 150*, 2010 WL 4922880, at *1 (C.D. Ill. Nov. 29, 2010), citing *Jackson v. Bunge Corp.*, 40 F.3d 239, 246 (7th Cir. 1994).  Plaintiff has not supported or developed her hearsay objection in any way, aside from a rote citation to Rules 801 and 802, or shown why the circumstances of the case would support barring the arbitrator's findings.  "Federal Rule of Evidence 103(a)(1) requires an objecting party to make specific objections detailing the specific evidence it wishes to strike and stating the specific grounds for striking it[,]" and "[o]bjections lacking specificity do not satisfy the requirements of Rule 103, and a loosely formulated and imprecise objection does not preserve error."  *Network Multifamily Security Corp. v. Homes for America Holdings, Inc.*, 2012 WL 13093946, at *5 (N.D. Tex. Aug. 29, 2012).  The court must be fully apprised of the grounds of an objection, and Plaintiff has not done so here, so the objection on hearsay grounds is overruled. See *Network Multifamily*, 2012 WL 13093946, at *5.

Plaintiff also challenges the admissibility of the arbitrator's findings on the basis of relevance pursuant to Federal Rules of Evidence 401 and 402.  The court is confident in its ability only to consider materially relevant facts that are properly before it.

Murphy's claims against Plaintiff were not true.  Plaintiff also cited Williams'
attendance at one of her grievance hearings for her ten-day suspension, even though he
was not a witness.  Plaintiff also testified that, at her grievance hearing, Williams stated
that he had nothing to do with Plaintiff's suspension, which Plaintiff believed was not
true.

Plaintiff felt that during the Murphy investigation, Finch was hostile to her
because Plaintiff was a white, homosexual female.  Plaintiff based this belief both on
Finch asking her how many black people Plaintiff supervised or had on staff and on
what Carpenter had told her about Finch's attitudes toward Plaintiff because of her skin
color.  Plaintiff also believed that Finch discriminated against her by conducting an
unwarranted investigation of Murphy's complaint and by suggesting that she receive a
suspension without pay.  Plaintiff testified that Finch did this because of Plaintiff's
"truthful testimony" in the Murphy investigation.

Plaintiff believed that Carpenter did not like her due to her age and because she
was a white homosexual female.  Plaintiff's basis for this belief is that Carpenter signed
the forms for her suspension and job elimination, even though he allegedly knew that
she was not guilty of misconduct.  Plaintiff also believed that Carpenter discriminated
against her by giving her a suspension without pay while he gave Murphy leave with
pay at the same time.

On March 1, 2021, Plaintiff filed a Charge of Discrimination against the City with
the Equal Employment Opportunity Commission ("EEOC") and the Illinois
Department of Human Rights ("IDHR") claiming race, sex, and age discrimination as
well as retaliation.

25

*Procedural History*

Plaintiff filed her Complaint (#1) on June 1, 2021, in which she alleges: Count I-sex discrimination on the basis of her gender and sexual orientation, in violation of the Equal Protection Clause, against all Defendants; Count II- racial discrimination, in violation of the Equal Protection Clause, against all Defendants; Count III-discrimination under Title VII, when she was unlawfully terminated from employment on the basis of her race, gender, and sexual orientation, against Defendant City; Count IV- retaliation for engaging in protected activity by cooperating with the investigation regarding Murphy's discrimination complaint and by providing truthful testimony, in violation of Title VII, against Defendant City; Count V- discrimination under the ADEA for her unlawful termination, against Defendant City; Count VI- discrimination on the basis of gender, age, sexual orientation, and race for Plaintiff's unlawful termination, and retaliation for engaging in protected activity under the IHRA, against Defendant City.

Plaintiff also appears to allege, in Counts I and II, that Defendants' actions "reflect[ed] a policy, custom, or pattern of official conduct of engaging in and condoning discrimination based on" Plaintiff's protected characteristics.  Thus Plaintiff states a claim pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).

ANALYSIS

Defendants argue that summary judgment in their favor is appropriate on all claims because: (1) Plaintiff cannot show background circumstances demonstrating that the City is the unusual employer that discriminates against white employees; (2) Plaintiff cannot identify similarly situated employees who were treated more favorably

26

than her; (3) Defendants had legitimate, non-discriminatory reasons for the adverse employment actions taken against Plaintiff, and she cannot show pretext; (4) looking at the evidence as a whole, there is insufficient evidence for Plaintiff to demonstrate a genuine issue of material fact on the claim of discrimination and retaliation; and (6) the individual Defendants are entitled to qualified immunity.

I.      *Summary Judgment Standard*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  In ruling on a motion for summary judgment, a district court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).  In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.  See *Anderson v. Liberty Lobby, Inc.*,  477 U.S. 242, 255 (1986); *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010).  However, a court's favor toward the nonmoving party does not extend to drawing inferences which are only supported by speculation or conjecture.  See *Singer*, 593 F.3d at 533.  In addition, this court "need not accept as true a plaintiff's *characterization* of the facts or a plaintiff's legal conclusion." *Nuzzi v. St. George Cmty. Consol. Sch. Dist. No. 258*, 688 F.Supp.2d 815, 835 (C.D. Ill. 2010) (emphasis in original).

The party opposing summary judgment may not rely on the allegations contained in the pleadings. *Waldridge*, 24 F.3d at 920.  "[I]nstead, the nonmovant must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387

F.3d 921, 924 (7th Cir. 2004). Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004), quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Specifically, to survive summary judgment, the nonmoving party "must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 936 (7th Cir. 2007), citing *Celotex Corp.*, 477 U.S. at 322-23.

## II.   Racial, Gender, and Sexual Orientation Discrimination Claims

The court first considers Plaintiff's racial, gender, and sexual orientation discrimination claims under the Equal Protection Clause, Title VII, and the IHRA, as alleged in Counts I, II, III, and VI of the Complaint.[13] Plaintiff claims that she was discriminated against on the basis of her race, gender, and sexual orientation when Defendants suspended her for ten days and eliminated her position on November 3, 2020.

Plaintiff has asserted essentially the same claims (racial, gender, and sexual orientation discrimination) under three different causes of action: Title VII, the Equal Protection Clause pursuant to § 1983, and the IHRA. The facts underlying each claim of discrimination under these causes of action are the same. In regard to Title VII and the

---

[13]The court will consider Plaintiff's ADEA claim from Count V separately, as ADEA claims are governed by a slightly different standard, as will be explained below. The court will consider Plaintiff's age discrimination claim under the IHRA in Count VI along with the ADEA claim, as IHRA age discrimination claims are analyzed in the same way as federal ADEA claims. See *Teruggi v. CIT Group/Capital Finance, Inc.*, 709 F.3d 654, 659 (7th Cir. 2013).

IHRA, the Seventh Circuit has held that "[t]he analytical framework for all three[14] statutes is 'essentially identical,' and therefore we need not analyze them separately." *Bagwe v. Sedgwick Claims Management Services, Inc.*, 811 F.3d 866, 879 n.39 (7th Cir. 2016), quoting *Brown v. Advocate South Suburban Hospital*, 700 F.3d 1101, 1104 n.1 (7th Cir. 2012). In addition, the Seventh Circuit has stated that "the same standards for proving intentional discrimination apply to Title VII and § 1983 equal protection." *Williams v. Seniff*, 342 F.3d 774, 788 n.13 (7th Cir. 2003). Accordingly, the court will consider all the alleged counts and causes of action against Defendants together under the same analysis.

In discrimination cases, to survive summary judgment, a plaintiff must present evidence that would permit a reasonable factfinder to conclude that the plaintiff's protected characteristic caused the discharge or other adverse employment action. *Khungar v. Access Community Health Network*, 985 F.3d 565, 573 (7th Cir. 2021). Previously, courts analyzed discrimination claims under "direct" or "indirect" methods of proof, but the Seventh Circuit, in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), "roundly rejected" that approach. *LaRiviere v. Board of Trustees of Southern Illinois University*, 926 F.3d 356, 359 (7th Cir. 2019). Now, "[a]t summary judgment, the critical question is whether the plaintiff has produced enough evidence to permit a reasonable factfinder to conclude that the plaintiff's race or other proscribed factor caused the adverse employment action[,]" and that evidence is looked at holistically. *Chatman v. Board of Education of City of Chicago*, 5 F.4th 738, 746 (7th Cir. 2021).

---

[14]In addition to Title VII and the IHRA, *Bagwe* also involved a discrimination claim under 42 U.S.C. § 1981, a statute not at issue in this case.

"Unmistakable evidence of racial animus—racial epithets or explicitly race-motivated treatment—makes for simple analysis.  The more complicated cases arise when there is no smoking gun showing intentional discrimination."  *LaRiviere*, 926 F.3d at 359.  In such cases, the district court may then draw upon the familiar burden-shifting framework established by the U.S. Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to determine if triable issues exist.  Although the Seventh Circuit in *Ortiz* "rejected unhelpful distinctions between evidence, and emphasized that 'all evidence belongs in a single pile and must be evaluated as a whole[,]'" the court did leave the *McDonnell Douglas* burden-shifting test "as a viable option for pursuing employment discrimination claims."  *Barbera v. Pearson Education, Inc.*, 906 F.3d 621, 628-29 (7th Cir. 2018), quoting *Ortiz*, 834 F.3d at 766.  Indeed, where the parties organize their arguments in terms of the burden-shifting test, a district court may follow that framework in its analysis, keeping in mind *Ortiz*'s admonition to consider all the evidence as a whole.  *Barbera*, 906 F.3d at 629-31; *de Lima Silva v. Department of Corrections*, 917 F.3d 546, 559-61 (7th Cir. 2019).  In the instant case, both parties appear to rely primarily on the *McDonnell Douglas* burden-shifting test to organize their arguments, and the court does agree that the burden-shifting framework is useful in analyzing Plaintiff's claims, based on the arguments and evidence presented.  The Seventh Circuit has characterized the burden-shifting approach as having a "plaintiff-friendly operation in the ordinary case[.]" *Joll v. Valparaiso Community Schools*, 953 F.3d 923, 929 (7th Cir. 2020).

"The *McDonnell Douglas* burden-shifting framework requires plaintiff show: '(1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated

employees who were not members of her protected class were treated more favorably.'"
*Marnocha v. St. Vincent Hospital and Health Care Center, Inc.*, 986 F.3d 711, 718-19 (7th Cir.
2021), quoting *Carson v. Lake County, Indiana*, 865 F.3d 526, 533 (7th Cir. 2017). "If the
plaintiff establishes this prima facie case, the burden shifts to the defendant to articulate
a legitimate, nondiscriminatory reason for the adverse employment action, at which
point the burden shifts back to the plaintiff to submit evidence that the employer's
explanation is pretextual." *Marnocha*, 986 F.3d at 719 (cleaned up).

    A.    <u>First Prima Facie Element: Protected Class</u>

    Defendants concede that Plaintiff has satisfied the first element, that she is a
member of a protected class, with regard to her gender and sexual orientation
discrimination claims. Defendants argue, however, that Plaintiff cannot meet her
burden of showing background facts to support this first element of her racial
discrimination claim.

    Plaintiff is pursuing a reverse-discrimination claim, *i.e.*, a claim brought by a
white plaintiff. See *Hosick v. Chicago State University Board of Trustees*, 924 F.Supp.2d 956,
966 (N.D. Ill. 2013), citing *Mills v. Health Care Service Corp.*, 171 F.3d 450, 455-57 (7th Cir.
1999). The Seventh Circuit has modified the *McDonnell Douglas* framework in such a
context to require evidence of "background circumstances" supporting a racial
discrimination claim brought by a white plaintiff. *Bless v. Cook County Sheriff's
Department*, 9 F.4th 565, 574 (7th Cir. 2021). Thus, to survive summary judgment under
the burden-shifting approach in a reverse discrimination case, instead of the first
element of being in a protected class, a plaintiff "must show that 'background
circumstances exist to show an inference that the employer has reason or inclination to
discriminate invidiously against whites or evidence that there is something "fishy"

about the facts at hand[.]'" *Bless*, 9 F.4th at 574, quoting *Formella v. Brennan*, 817 F.3d 503, 511 (7th Cir. 2016).  Once the background circumstances are established, the rest of the burden-shifting analysis is the same.  *Bless*, 9 F.4th at 574.

Defendants argue that the record does not show that any of the individual Defendants ever mentioned race other than to investigate Murphy's allegations, disparaged white people, or demonstrated a history of favoritism towards non-whites.

Plaintiff argues that two pieces of evidence provide sufficient background circumstances to support an inference that Defendants had inclination to discriminate invidiously against whites, or at the least show that there is something "fishy" about the facts at hand.  First, Plaintiff cites to Carpenter's statements and "non-verbal gestures" to her that indicated Finch was prejudiced against whites; specifically, Carpenter's statement that Plaintiff should be careful because Finch had "a tendency to be prejudiced," and touching of his wrist and rubbing of his skin to indicate to Plaintiff that Finch's hostility was based on Plaintiff's skin color.  Second, Plaintiff cites to evidence of better treatment for a non-white comparator, Murphy, in that Murphy engaged in actual misconduct but was only placed on administrative leave with pay, whereas Plaintiff was suspended ten days without pay.

"[T]he Seventh Circuit has acknowledged that 'the contours of what constitutes a background circumstance' - like the bounds of which facts are fishy - 'are not precise.'" *Lupescu v. Napolitano*, 700 F.Supp.2d 962, 974 (N.D. Ill. 2010), quoting *Mills*, 171 F.3d at 455.  The background circumstances prong can be satisfied by evidence that members of one race were fired and replaced by members of another race; by evidence that employers are under pressure from affirmative action plans, customers, public opinion, the EEOC, a judicial decree, or corporate superiors imbued with belief in "diversity"; or

by evidence of a gross disparity in qualifications. *Bless*, 9 F.4th at 574.  Further, discriminatory remarks from decisionmakers or defendants "might be sufficient to establish the requisite background circumstance[.]" *Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1119 (7th Cir. 2009).  However, stray remarks from non-decisionmakers are not evidence that a decision had a discriminatory motive, although combined with other allegations may "give some sense" of the work environment.  *Lupescu*, 700 F.Supp.2d at 975, citing *Crabtree v. National Steel Corp.*, 261 F.3d 715, 723 (7th Cir. 2001).  When determining if a plaintiff has satisfied this prong, the court should be mindful that the background circumstance threshold is lower than that necessary for the discrimination claim as a whole.  *Lupescu*, 700 F.Supp.2d at 975, citing *Mills*, 171 F.3d at 457.

The court finds that Carpenter's alleged comments and non-verbal communication about Finch's bias against white people do not constitute "discriminatory remarks" sufficient to meet the background circumstances threshold.  In support of her argument that derogatory remarks can constitute sufficient background circumstances, Plaintiff cites to the district court decision in *Graham v. Village of Dolton*, 2011 WL 43026 (N.D. Ill. Jan. 6, 2011).  In that case, the defendant police chief (and others) made specific, racist, derogatory remarks directly to the plaintiff or about the plaintiff's race in the presence of the plaintiff and others, on multiple occasions.  *Graham*, 2011 WL 43026, at *6.  Similarly, in other cases the derogatory remarks at issue were directly made by the defendants and/or decisionmakers to, or in the presence of, the plaintiff.  See *Lupescu*, 700 F.Supp.2d at 975; *Nagle*, 554 F.3d at 1119.

Here, by contrast, there is no actual evidence of any derogatory remark or statement made by Finch, only Plaintiff's testimony that Carpenter told her, verbally and through non-verbal communication, that Finch's perceived hostility towards her was because Finch was prejudiced against white people.  There is no testimony or other evidence as to how Carpenter knew this, or of Finch expressing any bias or acting in a discriminatory manner towards white people.  Plaintiff is testifying as to Carpenter's subjective opinion as to why Finch appeared hostile to Plaintiff during the interview, which essentially "amounts to inadmissible speculation regarding someone else's state of mind."  *Wyman v. Evergos, Inc.*, 2017 WL 386651, at *2 (N.D. Ill. Jan. 27, 2017); see also *Cummings v. Worktap, Inc.*, 2019 WL 4221652, at *9 (N.D. Cal. Sept. 4, 2019) ("In addition, Chris is not competent to opine on the Individual Defendants' motive for classifying themselves as independent contractors; nor is he competent to opine or speculate on whether their actions were intended to avoid the payment of taxes."); *Shaoxing Bon Textiles Co., Ltd. v. 4-U Performance Group LLC*, 2017 WL 6413993, at *5 n.4 (S.D.N.Y. Nov. 22, 2017) ("These assertions of someone else's state of mind have no probative value and are inadmissible.").  Plaintiffs seeking to thwart summary judgment must provide testimony based on personal knowledge, and while personal knowledge can include reasonable inferences, "it does not include speculating as to an employer's state of mind, or other intuitions, hunches, or rumors."  *Widmar v. Sun Chemical Corp.*, 772 F.3d 457, 460 (7th Cir. 2014).  This evidence simply does not approach the level of derogatory remark held to qualify as background circumstances of reverse racial discrimination.  Finch may have been hostile or contentious with Plaintiff during the investigatory

interviews, but the question is whether Finch was motivated by Plaintiff's race or some other characteristic, and outside of Carpenter's speculative comments there is no evidence that she was so motivated. See *Jackson v. Illinois Department of Commerce and Economic Opportunity*, 2022 WL 3009598, at *5 (7th Cir. July 29, 2022).

Next, concerning better treatment of a similarly situated comparator, the court finds that Murphy was similarly situated to Plaintiff. To determine whether employees are similarly situated, courts ask "whether the other employees' situations were similar enough to the plaintiff's that it is reasonable to infer, in the absence of some other explanation, that the different treatment was a result of race or some other unlawful basis." *de Lima Silva*, 917 F.3d at 559, quoting *Luster v. Illinois Department of Corrections*, 652 F.3d 726, 730 (7th Cir. 2011). To be "similarly situated," co-workers must be directly comparable to the plaintiff in all material aspects, but they need not be identical in every conceivable way. *Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 802 (7th Cir. 2014). There must be enough common factors to allow for a meaningful comparison in order to divine whether intentional discrimination was at play, which, in the usual case, means a plaintiff must at least show that the comparators held the same type of job, were disciplined by the same supervisor, were subject to the same standards, had comparable experience and qualifications, and engaged in the same conduct without differentiating or mitigating circumstances. *Bodenstab v. County of Cook*, 569 F.3d 651, 657 n.2 (7th Cir. 2009). Still, this is not a "magic formula," and the similarly situated inquiry should not devolve into a mechanical, one-to-one mapping between employees. *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012).

Plaintiff and Murphy dealt with the same supervisor in Carpenter (or maybe even Williams), and the evidence demonstrates that they were subject to the same standards or engaged in similar conduct without such differentiating circumstances as would distinguish their conduct or Carpenter's treatment of them. The evidence establishes that Plaintiff was Murphy's supervisor, as she helped hire Murphy and had the authority to issue discipline to Murphy, albeit not without the approval of Carpenter and/or Williams. Still, while the Seventh Circuit has stated "many times" that "supervisors usually make poor comparators for plaintiffs claiming employment discrimination[,]" the court of appeals has also acknowledged that "usually does not mean always," and it has "not held that a supervisor is never an apt comparator." *Rodgers*, 657 F.3d at 517-18. Where, as here, uneven discipline is the basis for a claim of discrimination, the most relevant similarities are those between the employees' alleged misconduct, performance standards, and disciplining supervisor. *Rodgers*, 657 F.3d at 518. "Thus, when a plaintiff and his supervisor were accused of making similar mistakes, were equally responsible for avoiding those mistakes, and were disciplined by the same superior, the plaintiff can make a realistic comparison with his supervisor for purposes of establishing a prima facie case of discrimination." *Rodgers*, 657 F.3d at 518.

Here, Plaintiff was accused of: (1) insubordination in not enforcing Williams' directive to stop checking IDs at the pool, even though Plaintiff claims that she notified Carpenter in advance and got approval from him; (2) failure to discipline Murphy earlier; and (3) retaliation for Murphy filing a complaint against her on August 5, 2020. For this Plaintiff got a ten-day suspension without pay.

36

Murphy, on the other hand, engaged in such misconduct as repeated tardiness, call offs, failure to show, and leaving her job site, resulting in Carpenter giving her administrative leave with pay.

In a recent decision, the Seventh Circuit found comparably serious the misconduct of a meter-reading white plaintiff who engaged in "meter curbing," which "undermined the core function of the utility," and that of a black coworker, who took unauthorized leave for multiple hours every day. *Dunlevy v. Langfelter*, 52 F.4th 349, 354 (7th Cir. 2022). The court of appeals, warning that courts should not draw the question of who is similarly situated too narrowly, found that a "reasonable factfinder [could] infer that an employee taking unauthorized leave for multiple hours every day is engaging in serious misconduct[,]" as, "[a]fter all, an employee who simply fails to show up to work undermines the utility's core mission just as much as an employee who shows up but periodically does a poor job." *Dunlevy*, 52 F.4th at 354. The court concluded that "[o]n the facts of this case, Dunlevy's meter curbing undermined the core function of the utility, and Murray's tardiness and absences undermined a basic tenet of any employment: be present." *Dunlevy*, 52 F.4th at 354.

Likewise in the instant case, although Plaintiff's alleged misconduct of insubordination and retaliation are serious, so to is Murphy's alleged misconduct of chronic tardiness and absences, which undermines "a basic tenet of any employment: be present." *Dunlevy*, 52 F.4th at 354. Taking the evidence in the light most favorable to Plaintiff, a factfinder could find that Murphy was at least deserving of similar, if not greater, discipline for her alleged misconduct. The argument Defendants offer as to why Murphy was not similarly situated to Plaintiff is that Plaintiff was Murphy's supervisor and could discipline Plaintiff. However, as already noted, when uneven

37

discipline is the basis for a claim of discrimination, a supervisor can be a valid comparator to an employee, as the most relevant similarities are those between the employees' alleged misconduct, performance standards, and disciplining supervisor. See *Rodgers*, 657 F.3d at 518. Thus, the court finds that Plaintiff has provided sufficient background circumstances to meet the first prong in making a prima facie case of reverse racial discrimination.[15] As stated, Plaintiff has demonstrated that she has satisfied the protected status prong with regard to her gender and sexual orientation discrimination claims.

B.    Second Prima Facie Element: Meeting Employer's Legitimate Expectations

Defendants concede that Plaintiff was meeting her employer's legitimate expectations, so Plaintiff has satisfied this element of her prima facie case.

C.    Third Prima Facie Element: Materially Adverse Employment Actions

Defendants concede that Plaintiff's ten-day suspension without pay and elimination of her position constitute materially adverse employment actions. Plaintiff has satisfied this element of her prima facie case.

---

[15]The court would note that Plaintiff's background circumstances evidence, of Finch's prejudice and Murphy as a comparator, only concern her *suspension*. Plaintiff provided no evidence, and made no argument, that background circumstances demonstrating racial bias(es) against whites existed with respect to her position elimination. By failing to make such arguments, the court finds Plaintiff has waived any arguments against Defendants' summary judgment arguments on these claims, and thus the court may infer Plaintiff has conceded those points. See *Cintora v. Downey*, 2010 WL 786014, at *4 (C.D. Ill. Mar. 4, 2010) (finding that the plaintiff's failure to address the defendants' argument that their lack of personal involvement entitles them to summary judgment on the plaintiff's excessive force claims conceded the point, as the general rule in the Seventh Circuit is that a party's failure to respond to an opposing party's argument implies concession).

D.      Fourth Prima Facie Element: Similarly Situated Employees Outside Her
        <u>Class Treated More Fairly</u>

Defendants argue that Plaintiff cannot show that there were similarly situated

employees who were outside her protected classes (white, female, and lesbian) who

were treated more fairly, whether with regard to her suspension or position

elimination.            **1.      Suspension**

For her suspension, Plaintiff points to Murphy and Carpenter as comparators

outside her protected class who engaged in similar misconduct yet received more

favorable treatment.  For the reasons discussed above, Murphy is a valid comparator.

Carpenter is a straight male, and thus outside of two of Plaintiff's protected groups.

Like Plaintiff, Carpenter is a supervisor and department head.  Carpenter and Plaintiff

both answer to the same supervisor, in the sense that Williams held ultimate authority

over them and had final approval over disciplinary matters.  However, Carpenter was

Plaintiff's immediate supervisor at the time of her suspension and position elimination,

making his suitability as a comparator questionable, and, as with Murphy, Plaintiff

must provide evidence that she and Carpenter were held to the same performance

standards or that she and Carpenter made similar mistakes and were equally

responsible for avoiding those mistakes.  See *Rodgers*, 657 F.3d at 518.

Plaintiff argues that, like her, Carpenter engaged in insubordination when he

ignored Williams' 2019 email directive that all supervisors must get Williams' approval

before issuing discipline to City employees.  Carpenter admitted that he failed to get

Williams' approval before allowing Plaintiff to discipline Murphy or before he placed

Murphy on administrative leave.  Carpenter was never disciplined at all by Williams

for this alleged misconduct.  The court finds that the alleged misconduct of Carpenter is

similar to that of Plaintiff's: insubordination by disobeying an email directive from

Williams.  A factfinder, taking evidence in the light most favorable to Plaintiff, could find that disobeying the mayor's order to stop checking IDs at the public pool could be of similar seriousness to disobeying the mayor's order to get his approval before disciplining subordinates.  Carpenter's justification, that he did not view Plaintiff's coaching of Murphy as "discipline," could be seen by a factfinder as hypertechnical, and does not explain his placing of Murphy on administrative leave, which was certainly disciplinary.

Defendants, in response, offer only two arguments.  The first is that Murphy and Plaintiff are not similarly situated because Murphy was Plaintiff's supervisor.  For reasons already discussed in detail above, that argument is unpersuasive.  Next, Defendants argue that there was no "uneven discipline" because Williams did not know about Carpenter's alleged insubordination in disciplining Murphy.  But this is not true.  At page 58 of Williams' May 10, 2022, deposition (#29-4), Williams states that Carpenter never asked his permission to discipline Murphy and put her on administrative leave.  Williams testified that Carpenter was allowed to discipline Murphy without his (Williams') approval "[b]ecause of our City ordinances[,]" and that City ordinances give "supervisors the authority to make those types of decisions and Mr. Carpenter was the supervisor, so yes."

Williams testified that he was not aware of these ordinances when he issued his directive on discipline, but testified that "I have the authority to manage the City, so if I choose to enter such a directive, I may.  However, there are still ordinances in place despite any directive that I may give."  A factfinder, taking all evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in her favor, could find Williams' explanation for the disparate discipline for similar misconduct not

credible.  The court finds that Carpenter qualifies as a similarly situated comparator, and that Plaintiff has made her prima facie case for discrimination on racial, gender, and sexual orientation grounds as it relates to her suspension.

### 2.        Position Elimination

Plaintiff argues that the traditional "similarly situated" comparator prong from the *McDonnell Douglas* burden-shifting analysis should not apply to her position elimination discrimination claim.  Rather, because her position was eliminated and her job duties absorbed by other employees, Plaintiff argues that hers is a "mini-reduction-in-force," or "mini-RIF," claim.  Defendants argue that Plaintiff's job was eliminated, that her department no longer exists, and that "only a few of her job duties have been absorbed by other employees."  Defendants argue that those employees, Lane and Greer, "primarily perform other tasks that are unrelated to the job duties that had been performed by Plaintiff."

The mini-RIF case is different from a standard reduction-in-force case where a plaintiff's position is eliminated entirely and will not be refilled.  *Filar v. Board of Education of the City of Chicago*, 526 F.3d 1054, 1060 (7th Cir. 2008).  "The point of a mini-RIF, unlike a true RIF, is that the job really was not eliminated at all; because the fired employee's duties were absorbed by others, they were effectively 'replaced,' not eliminated."  *Bellaver v. Quanex Corp.*, 200 F.3d 485, 495 (7th Cir. 2000).  In a mini-RIF case, where the dismissed employee's duties are absorbed by another employee or employees rather than eliminated, the court applies a modified version of the fourth prong of the prima facie case, which requires proof that the plaintiff's duties were absorbed by employees not in the protected class.  *Petts v. Rockledge Furniture, LLC*, 534 F.3d 715, 725 (7th Cir. 2008).  Thus, because Plaintiff has explicitly framed her argument

41

on the fourth prong (in her Response at pages 62 through 65) of the burden-shifting test as a mini-RIF, the court will address it on those grounds.  See *Filar*, 526 F.3d at 1061.

"In determining whether to apply the RIF or mini-RIF requirements, the key inquiry is whether the employer still needed someone to handle the terminated employee's job functions."  *Young v. Illinois Department of Revenue*, 2008 WL 162120, at *4 (C.D. Ill. Jan. 16, 2008).  In order to succeed on a gender or sexual orientation discrimination claim under the mini-RIF framework, a plaintiff must show that her duties were absorbed mainly by male and/or heterosexual employees.  *Young*, 2008 WL 162120, at *4.  What this means in practice is that someone outside of Plaintiff's protected class must have absorbed the *main* duties of Plaintiff's former position, not just the minor duties.  See *Lewis v. Indiana Wesleyan University*, 2022 WL 2528314, at *11 (N.D. Ind. July 7, 2022).  Even if some of a plaintiff's duties were absorbed by employees outside of the protected class, a mini-RIF claim will fail if other duties were absorbed by those within the plaintiff's protected class.  *Petts*, 534 F.3d at 726.

Here, three coworkers have been put forward as having absorbed some of Plaintiff's former duties: Carpenter, Greer, and Lane.  Carpenter, though older than Plaintiff, is a heterosexual male.  Greer, although a woman, is 31-year old heterosexual.  Lane is a heterosexual male, but is older than Plaintiff.  All three of these coworkers, in some aspect, fall outside of Plaintiff's protected classes.  However, all three of these coworkers have one characteristic *within* one of Plaintiff's protected classes.  Carpenter and Lane are both older than Plaintiff, and Greer is a woman.  None of the coworkers are gay or lesbian.  Thus, this case does not fall neatly into the binary approach articulated in *Petts*, where even if some of a plaintiff's duties were absorbed by employees outside of the protected class, a mini-RIF claim would fail if other duties

were absorbed by those within the plaintiff's protected class. Here, due to the multiple protected classes to which Plaintiff belongs, the three coworkers who absorbed Plaintiff's duties were both *inside* and *outside* Plaintiff's protected classes. Therefore, in order to determine if Plaintiff has satisfied the mini-RIF prong of her prima facie case, the court will look to whether Carpenter, Lane, and Greer absorbed the *main* duties of Plaintiff's former position, not just the minor duties. See *Lewis,* 2022 WL 2528314, at *11.

Plaintiff puts forward Carpenter, Greer, and Lane as employees outside her protected classes who absorbed her former job duties. First, Carpenter took over one aspect of Plaintiff's job duties: contracts. Plaintiff managed office functions and documents for the division of recreation, which included ordering supplies when needed and handling contracts or lease agreements for recreational facilities. The managing of the office was just one of Plaintiff's job duties, and handling contracts was a smaller aspect of that duty. Still, the court is cognizant that handling contracts for recreational facilities is a not insignificant job duty, as it ensures the availability of various facilities for recreation department activities. Handling contracts also extends into financial responsibilities for the department. Still, when viewed as whole against the entirety of Plaintiff's job duties, and the purpose of her job, handling contracts for facilities is a relatively minor aspect, or just one aspect among many. By itself, it would not satisfy the mini-RIF element for a prima facie case.

Next, the court will look at any duties inherited by Greer when she was named to the position of community relations administrator, newly created just months after Plaintiff's position was eliminated. Greer took over two of Plaintiff's specific program duties: the Vermilion River Fall Festival and the Christmas Craft Show. In addition to the two programs, Greer, as community relations administrator, also took over

handling the promotional duties for recreational events that used to be done by Plaintiff, including social media and radio and newspaper promotion.  However, based on the facts submitted by the parties, Greer's position encompasses social media engagement for the City as a whole, not just Plaintiff's old recreation department social media promotion.  Further, again based on the submitted facts, the court cannot say that social media promotion was a main duty of Plaintiff's position, as opposed to an incidental duty necessitated by Plaintiff's position as superintendent of recreation.  Still, the Vermilion River Fall Festival and Christmas Craft Show appear to fall more in the main duty category as opposed to minor duties.

Finally, Plaintiff submits Lane as a comparator outside her protected class who absorbed major duties from her eliminated position.  During her tenure as superintendent of recreation, Plaintiff shared responsibility for facility rentals with Terra Deneau, program support specialist, and Lane, who was the City's parks and property manager and oversaw the daily operations of all parks and City public properties.

Following the elimination of Plaintiff's position, Lane took over grounds maintenance (for one hour per day from April to November), operations at the Harrison Park Club (something that took roughly 30 minutes per week of Lane's time), downtown parking (something that took roughly one hour per week of Lane's time), concession stand leases from April to November (for less than 30 minutes each week), maintenance of softball fields for Danville Area Community College (for less than 30 minutes each week for three months a year), oversight of mini-parks (for 30 minutes a week from April to November), and he now assists with no more than six Danville

44

Challengers baseball games per year (for a total of 3 hours of Lane's time out of the year).

Totaling up the newly added weekly duties, Lane absorbed about 7.5 to 8 hours per week of Plaintiff's former duties (grounds maintenance, mini-parks oversight, downtown parking, Harrison Park Club operations, and concession stand leases for only half the year), out of a presumably 40-hour work week.  The Danville Challengers baseball games, at a total of 3 hours out of the entire year, is negligible time, and can hardly be said to constitute a major job duty.  The absorption of Plaintiff's former duties roughly constituted around 20% of Lane's total job duties.

In contrast to the job duties absorbed, the vast bulk of the programs and job duties formerly performed by Plaintiff were either discontinued altogether or absorbed by other unnamed employees[16]: the annual Golden Wedding Celebration; Easter Egg Hunts; running the summer and fall softball and kickball leagues; handling field and facility maintenance for the spring high school and junior college baseball and junior college softball teams; and running operations at the municipal pool.  In addition to the department programs, unoccupied buildings and city corridors do not appear to have been absorbed by Carpenter, Greer, or Lane.  Plaintiff also formerly oversaw 28 seasonal employees, but that management duty has been eliminated entirely as the City no longer employs seasonal employees.  Many of the programs overseen by Plaintiff, such as the Golden Wedding Celebration, Easter Egg Hunt, and the softball leagues and other recreational activities are no longer held or in operation due to COVID-19.  Since

---

[16]The only employees named by Plaintiff as absorbing her former duties were Carpenter, Greer, and Lane.

the elimination of Plaintiff's position in late 2020, the COVID-19 pandemic has eased, and many events or activities around the country that had been canceled due to the pandemic have returned, but Plaintiff has not provided any evidence that these specific City programs have returned.

One major program overseen by Plaintiff, the municipal pool, also remains closed and not due to reopen until 2024 at the earliest due to COVID-19 and safety issues following Carpenter's evaluation of the pool.  If the pool has been reopened and the duties surrounding the pool given to another City employee, Plaintiff has not provided any evidence as to who that employee is and if they are outside of Plaintiff's protected classes.  The court, in attempting to gauge Plaintiff's major duties versus minor duties, and how to measure the percentage of time each duty took out of Plaintiff's work day, is working with its own rough estimate based on the facts provided in the briefs and attested to in Lane's declarations, at least as it pertains to how much time he devoted to his new duties inherited from Plaintiff.  The court realizes that it must view the evidence in the light most favorable to Plaintiff, but, in making her prima facie case, the burden is on Plaintiff to present definite, competent evidence from which the court can determine whether most of her job duties were absorbed mostly by employees outside her class.  See *Bellaver*, 200 F.3d at 495 (noting that a previous case stood for the proposition that a mini-RIF exists where job duties "were absorbed mostly" by employees outside of the protected class); *Hamilton v. National Propane*, 276 F.Supp.2d 934, 946 (W.D. Wis. 2002) ("At minimum, case law indicates that plaintiff's duties need to be absorbed mostly by [employees outside of the class], not entirely"); *Kazhinsky v. William W. Meyer & Sons, Inc.*, 2003 WL 22735867, *5

46

(N.D. Ill. Nov. 19, 2003) ("Because half of the individuals who assumed the [plaintiff's] job duties were in the protected class, she cannot show that her duties were assumed solely or even primarily by employees outside the protected class.").

The evidence before the court is that, while some of Plaintiff's job duties have been absorbed by employees outside of her protected classes, even some duties that could be characterized as main, the vast bulk of her job duties have simply ceased to be performed altogether upon the elimination of her position, and thus, her mini-RIF theory fails and she has not established a prima facie case. See *Lewis*, 2022 WL 2528314, at *11; *Young*, 2008 WL 162120, at *4 ("While Doug Strohm, a male, absorbed some of Young's prior responsibilities, the record also shows that Carla Wester, a female, took over Young's duties relating to the Pik & Pak Unit and the Mail and Messenger Services Unit.  Indeed, it appears from the record that Wester, not Strohm, absorbed the bulk of Young's duties.  As such, the inference of discrimination, normally present in a mini-RIF, does not arise on these facts, because the majority of Young's job duties were absorbed by one of Young's fellow class members.").  Having found Plaintiff cannot make her prima facie case, the court need not subject Defendants to the pretext inquiry.[17]  See *Widmar* 772 F.3d at 463.

---

[17]Plaintiff has not framed her argument for the position elimination claim in the traditional similarly situated prong context, nor has she provided comparators for a similarly situated argument, instead relying wholly on the mini-RIF analysis.

E.     Pretext

Because the court has found that Plaintiff has made a prima facie case with

regard to her discrimination claim related to her suspension, the court proceeds to the

pretext analysis on that claim only.  Once a plaintiff has made a prima facie case, the

burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for

the adverse employment action, at which point the burden shifts back to the plaintiff to

submit evidence that the employer's explanation is pretextual.  *Marnocha*, 986 F.3d at

719.  Pretext involves more than just faulty reasoning or mistaken judgment on the part

of the employer; it is a lie, specifically a phony reason for some action.  *Lord v. High

Voltage Software, Inc.*, 839 F.3d 556, 564 (7th Cir. 2016).  When assessing a plaintiff's claim

that an employer's explanation is pretextual, the court cannot second-guess the

employer's facially legitimate business decisions.  *Lord*, 839 F.3d at 564.  An employer's

reasons for taking an adverse action can be foolish or trivial or even baseless, but as

long as they are honestly believed, they are not pretextual.  *Lord*, 839 F.3d at 564.

Here, Defendant has cited three legitimate, non-discriminatory reasons for

Plaintiff's suspension: her failure to carry out the directive not to check IDs of persons at

the pool; not issuing corrective discipline against Murphy for her repeated tardiness,

call offs, failure to show, and leaving her job site; and retaliating against Murphy with

the coaching session after Murphy filed the complaint against her.  The court finds that

these are legitimate reasons for the meting out of discipline following an investigation.

Plaintiff, however, has provided competent evidence calling into question

Defendants' explanations for the suspension.  First, although Plaintiff's direction to pool

staff to continue checking IDs was in direct contravention of Williams' order, Plaintiff

48

testified that she had informed and received approval from her direct superior, Carpenter, to continue doing so. Although Carpenter, at his deposition, denied knowing and approving of Plaintiff's plan to resume checking IDs, Carpenter did tell Finch during the September 9, 2020, investigatory interview that he was aware that Plaintiff and pool employees had gone back to checking IDs, and that he had told Plaintiff that they "should probably" stop asking for IDs, "or, if we ask for them and they do not have one then just ask them for their names and address, so we have a record of who is inside the pool." Based on Williams' insistence that Plaintiff should be suspended for ten days, Carpenter ultimately issued Plaintiff a ten-day suspension, even though Carpenter felt a five-day suspension was more appropriate. Carpenter did believe that Plaintiff had "somewhat" disobeyed his order not to check IDs at the pool. However, the evidence of shifting, inconsistent explanations of insubordination undermines this basis for the suspension, and would allow a factfinder to find that Defendants, or at least Carpenter, did not honestly believe that Plaintiff had engaged in misconduct by resuming checking IDs at the pool.

Next, concerning Plaintiff's failure to discipline Murphy sooner, Plaintiff testified that Carpenter told her that he thought Murphy's allegations against Plaintiff were "BS" because he knew that Murphy was missing work and leaving work early, and he knew that Plaintiff had verbally addressed it with Murphy. This evidence suggests that Plaintiff was not actually guilty of the misconduct alleged with regard to failure to discipline Murphy sooner, and that at least one decisionmaker in this scenario who signed off on the ten-day suspension, Carpenter, did not believe it was warranted and that Plaintiff had already taken corrective action on it.

49

Finally, with regard to retaliation, one decisionmaker, Carpenter, testified that he did not personally believe that Plaintiff had retaliated against Murphy.  The second decisionmaker, Finch, who recommended Plaintiff's suspension following the investigation, testified that Plaintiff admitted to her at the September 9, 2020, investigatory interview, that she had known about Murphy's August 5 complaint to Finch before she issued Murphy the coaching on August 11, thus indicating to Finch that Plaintiff had retaliated against Murphy for her complaint.  However, the transcript of the September 9, 2020, interview indicates only that Plaintiff was aware of Murphy's August 6, 2020, meeting with Carpenter, and that Plaintiff assumed the meeting was about Plaintiff and Murphy's issues at the pool.  There is no direct admission in that interview transcript that Plaintiff was aware on August 11 that, when Murphy met with Finch on August 5, Murphy had filed an official complaint against Plaintiff.  Outside of Finch's testimony and report, there is no evidence in the record of Plaintiff admitting that, before August 11, 2020, she knew that Murphy had filed a discrimination complaint against her on August 5.  Thus, a factfinder could find that, while Plaintiff might have been aware Murphy met with Finch on August 5, she was not specifically aware that Murphy filed an official complaint against Plaintiff on that day.  Taking the evidence in the light most favorable to Plaintiff, a factfinder could find that the main basis for Finch's retaliation finding did not actually happen, that Plaintiff never made such an admission, and/or that Finch did not honestly believe it because, even though she put it in her report, it appears nowhere in the transcript of the September 9, 2020, investigatory interview.

Further evidence undermining Defendants' stated reasons for the suspension is Carpenter's own testimony that the allegations were a quick way for Murphy to "make some money."  Lastly, Carpenter testified that Finch's interviews with Plaintiff were "contentious" and that Finch became "upset" with Plaintiff because she did not like the answers Plaintiff was providing.  Plaintiff herself testified that Finch was "hostile" towards Plaintiff during the interviews.

Based on the above, a factfinder, taking all evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in her favor, could find that Defendants' explanations for Plaintiff's ten-day suspension without pay were not honestly believed. Plaintiff's evidence undermines every legitimate reason put forth by Defendants, and a factfinder could find that the explanations were an effort to cover Defendants' "tracks or hide their real reason" for suspending Plaintiff.  See *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1175 (7th Cir. 2002).  "Yet, 'a showing of pretext alone is not enough; the plaintiff must also show that the explanations are a pretext *for the prohibited animus*."  *Chatman v. Board of Education of City of Chicago*, 5 F.4th 738, 747 (7th Cir. 2021), quoting *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 740 (7th Cir. 2013) (emphasis added).  To show pretext, Plaintiff must show not only that Defendants' "stated reasons for suspending her were dishonest or phony, but also that the true reason was based on prohibited discriminatory animus."  See *Benuzzi v. Board of Education of City of Chicago*, 647 F.3d 652, 663 (7th Cir. 2011).

Thus, Plaintiff must do more than simply allege that Defendants' stated reasons are inaccurate or dishonest; she must still have some circumstances to support an inference that there was an improper motivation proscribed by law, and this is where

her discrimination claim falters.  See *Benuzzi*, 647 F.3d at 663.  No reasonable jury could find that Plaintiff has made the requisite showing of racial, gender, or sexual orientation-based discriminatory animus.  For reasons already stated, Plaintiff's testimony regarding Carpenter's statements to Plaintiff about the basis for Finch's animosity towards her is not competent evidence of racial discrimination.  Next, even if the court were to assume that Defendants cut all of their reasons for disciplining Plaintiff from whole cloth, which is essentially what Plaintiff contends, there is nothing in the record that so much as hints that Defendants did so because of Plaintiff's race, gender, or sexual orientation.  See *Benuzzi*, 647 F.3d at 663-64.  Even if the court were to find that Finch and Williams "harbored a heated dislike for" Plaintiff, Plaintiff has not presented evidence supporting the inference that any of Defendants' antipathy toward her stemmed from her race, gender, or sexual orientation.[18]  See *Benuzzi*, 647 F.3d at 664. Without some semblance of a link between her protected characteristics and the suspension, Plaintiff's discrimination claim is destined to fail.  See *Benuzzi*, 647 F.3d at 664.

---

[18]Along with Carpenter's statements about Finch, Plaintiff's belief that Williams was hostile to her due to her sexuality because he was religious and never reached out to her to ask about her job when he took office, that Finch was hostile based on her race because she asked Plaintiff how many black people Plaintiff supervises or has on her staff (during an investigation into whether Plaintiff had discriminated against black people), and that Carpenter was hostile to her protected characteristics because he signed off on her suspension despite disagreeing with them, is based on pure speculation, and "a plaintiff's speculation is not a sufficient defense to a summary judgment motion."  *Karazanos v. Navistar International Transportation Corp.*, 948 F.2d 332, 337 (7th Cir. 1991).

Plaintiff may have shown that the reasons put forth for her suspension by Defendants were dishonest or at least not honestly believed by one or two of the decisionmakers, but Plaintiff has put forward no competent evidence suggesting that these reasons were otherwise a pretext for racial, gender, or sexual orientation discrimination.  See *Bless*, 9 F.4th at 575.

F.      Conclusion

Even having found Plaintiff cannot demonstrate a genuine issue of material fact with regard to prohibited discrimination under the more plaintiff-friendly burden-shifting approach, the court must keep in mind *Ortiz*'s admonition to consider all the evidence as a whole.  See *Barbera*, 906 F.3d at 629-31.

Outside of Carpenter's claimed statements to Plaintiff about Finch's attitude towards white people, there is simply no evidence in this case of discriminatory animus towards Plaintiff based on any of her protected characteristics.  For the reasons stated in the court's discussion on background circumstances, Carpenter's statements about Finch do not create a genuine issue of material fact as to whether discriminatory animus based on Plaintiff's race motivated, whether in whole or in part, any adverse actions taken against Plaintiff.  Taking all of the evidence presented into account, the court cannot say that the evidence would permit a reasonable factfinder to conclude that discriminatory animus towards Plaintiff based on her race, gender, or sexual orientation caused her suspension or position elimination.  See *Ortiz*, 834 F.3d at 765.  Thus, for the reasons stated above, summary judgment is granted in Defendants' favor on Plaintiff's Equal Protection, Title VII, and IHRA racial, gender, and sexual orientation discrimination claims in Counts I, II, III, and VI of the Complaint.

53

III.    *Age Discrimination*

In Counts V and VI of the Complaint, Plaintiff alleges unlawful discrimination based on her age under the ADEA and IHRA, respectively, in the adverse employment actions taken against her.  The court is considering Plaintiff's ADEA claim separately because, although both statutes share similar analytical approaches in applying *McDonnell Douglas* and *Ortiz*, Title VII turns on a broader "motivating factor" theory, whereas the relevant standard under the ADEA is whether age was the "but for" cause of the allegedly discriminatory employment action.  *Igasaki v. Illinois Department of Financial and Professional Regulation*, 988 F.3d 948, 960 (7th Cir. 2021).  "Title VII and ADEA causation standards are not always the same because of the availability of mixed-motive claims under Title VII but not the ADEA; and ... determining whether one factor was causal demands a different factual analysis than determining whether a different factor was causal." *Joll*, 953 F.3d at 928.  Thus, in this respect, the ADEA is narrower than Title VII of the Civil Rights Act of 1964.  *Igasaki*, 988 F.3d at 960.

Plaintiff's ADEA and IHRA claims fail for the same reasons her Title VII and Equal Protection claims failed: no prima facie case under *McDonnell Douglas* and no holistic evidence under *Ortiz*.  See *Igasaki*, 988 F.3d at 960.  Although Murphy and Greer are younger than Plaintiff, her age discrimination claim must fail for the same reasons articulated in the Title VII and equal protection race, gender, and sexual orientation analyses above.  "This much is clear even without accounting for the more onerous 'but for' standard of the ADEA." *Igasaki*, 988 F.3d at 961.  And moving from *McDonnell Douglas* to *Ortiz* does not help Plaintiff, because beyond the ages of Murphy and Greer, Plaintiff does not offer any evidence or argument specific to her age discrimination

54

allegations, and thus the court must conclude that age played no "but for" factor, let alone a factor at all, in Plaintiff's termination based on the evidence at summary judgment. See *Igasaki*, 988 F.3d at 961. Summary judgment is granted in favor of Defendants on Plaintiff's age discrimination claims under the ADEA (Count V) and IHRA (Count VI).

 *IV.* *Monell Claims*

 Plaintiff has also alleged a *Monell* claim in her constitutional discrimination claims in Counts I and II, in that "[t]he actions of each and all Defendants reflect a policy, custom, or pattern of official conduct of engaging in and condoning discrimination based on her [gender, sexual orientation, and race]." In her Response at pages 67 to 68, Plaintiff has modified her *Monell* argument somewhat to argue that the evidence shows that her injuries were "caused by individuals with final policymaking authority (Williams) and those he delegated with policymaking authority (Carpenter and Finch)." Plaintiff argues that, "Defendants have conceded that Williams and Carpenter were the final decisionmakers with respect to the employment actions alleged here[,]" and thus summary judgment should be denied on the *Monell* claim.

 To establish municipal liability and prevail on her *Monell* claim, it is not enough for Plaintiff to allege that the City's policy injured her. Rather, she must establish: (1) that she suffered a constitutional injury, and (2) that the City authorized or maintained a custom of approving the unconstitutional conduct. *Petty v. City of Chicago*, 754 F.3d 416, 424 (7th Cir. 2014). But if no constitutional violation occurred in the first place, a *Monell* claim cannot be supported. *Petty*, 754 F.3d at 424.

The court has granted summary judgment on Plaintiff's claims in Counts I and II, which are the only constitutional claims at issue in this case, finding that the individual Defendants did not violate Plaintiff's rights under the Equal Protection Clause pursuant to § 1983.  No constitutional violations have occurred in this case.  Thus, Plaintiff's *Monell* claim fails because she did not suffer a constitutional injury and so has no basis to support a *Monell* claim.  See *Petty*, 754 F.3d at 424-25, quoting *Houskins v. Sheahan*, 549 F.3d 480, 493 (7th Cir. 2008) ("we have said that '[i]t is well established that there can be no municipal liability based on an official policy under *Monell* if the policy did not result in a violation of [a plaintiff's] constitutional rights.'").  Summary judgment is granted in favor of Defendants on Plaintiff's *Monell* claim.

V.      *Retaliation Under Title VII and the IHRA*

Plaintiff's remaining claims are unlawful retaliation claims under Title VII (Count IV) and the IHRA (Count VI).  Plaintiff argues that Defendants unlawfully retaliated against her for engaging in protected activity when she participated in the investigation of Murphy's discrimination complaints.  Plaintiff argues that the disputed issue is whether jurors could infer that Plaintiff's protected activity was a "substantial or motivating factor" in Defendants decisions to suspend her and eliminate her position.  Plaintiff further argues that jurors could find evidence of a retaliatory motive based on: (1) Carpenter's statements to Plaintiff; (2) evidence of intentional dishonesty in the reasons for the adverse employment action; (3) evidence of shifting stories about the circumstances for the adverse employment actions; (4) evidence that the interviews

56

between Plaintiff and Finch were contentious and that Finch did not like the truthful testimony Plaintiff provided; and (5) evidence that Williams believed Plaintiff discriminated against Murphy, despite substantial evidence to the contrary.

"Title VII prohibits an employer from retaliating against an employee for opposing or participating in an investigation of an unlawful employment practice." *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018), citing 42 U.S.C. § 2000e-3(a). "To prevail on a Title VII retaliation claim, the plaintiff must prove that (1) he engaged in an activity protected by the statute; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action." *Lewis*, 909 F.3d at 866. The district court must consider the evidence as a whole and conduct a straightforward inquiry: Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the materially adverse action? *Abrego v. Wilkie*, 907 F.3d 1004, 1014 (7th Cir. 2018). As with discrimination claims, in a retaliation claim "Illinois courts apply the federal Title VII framework to IHRA claims." *Volling v. Kurtz Paramedic Services, Inc.*, 840 F.3d 378, 383 (7th Cir. 2016).

Defendants concede the first prong, that Plaintiff engaged in protected activity when she participated in Finch's investigation of Murphy's complaint, which included a complaint of discrimination against Plaintiff. Protected activity includes defending oneself against a charge of discrimination. *Deravin v. Kerik*, 335 F.3d 195, 203-05 (2d Cir. 2003). Defendants also concede that Plaintiff suffered two adverse employment actions when she was suspended for ten days without pay and when her position was eliminated. Defendants do contest the third prong, whether there was a causal link between Plaintiff's protected activity and those adverse actions.

57

To meet the causation element, a plaintiff "must prove the protected activity was the but-for cause of the adverse action—that 'the adverse action would not have happened without the activity.'" *Mollet v. City of Greenfield*, 926 F.3d 894, 897 (7th Cir. 2019), quoting *Carlson v. CSX Transportation, Inc.*, 758 F.3d 819, 828 n.1 (7th Cir. 2014). Plaintiff's formulation of the standard, that the issue is whether jurors could infer that Plaintiff's protected activity was a "substantial or motivating factor" in Defendants decisions to suspend her and eliminate her position, is no longer the law following the U.S. Supreme Court's decision in *University of Texas Southwest Medical Center v. Nassar*, 570 U.S. 338 (2013), where "the Court held that retaliation claims under Title VII require traditional but-for causation, not a lesser 'motivating factor' standard of causation." *Reynolds v. Tangherlini*, 731 F.3d 1093, 1104 (7th Cir. 2013), citing *Nassar*, 570 U.S. at 362. Thus, the question in this case is not whether Plaintiff's participation in the Murphy investigation was *a* but-for cause of the adverse actions, but rather whether her participation was *the* but-for cause of the adverse actions.  See *Mollet*, 926 F.3d at 897.

"A plaintiff can point to both direct and circumstantial evidence to demonstrate causation and survive summary judgment on a retaliation claim."  *Oudghiri v. South Bend Community School Corp.*, 2022 WL 843869, at *9 (N.D. Ind. Mar. 22, 2022), citing *Abrego*, 907 F.3d at 1015.  "Relevant causation evidence may include suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Oudghiri*, 2022 WL 843869, at *9, citing *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 924 (7th Cir. 2019).  When a defendant has offered multiple nondiscriminatory reasons for its adverse action, "showing that one of these reasons is pretextual is not

enough, although there may be circumstances where 'multiple grounds offered by the defendant ... are so intertwined, or the pretextual character of one of them so fishy and suspicious, that the plaintiff could withstand summary judgment.'" *Fischer v. Avande, Inc.*, 519 F.3d 393, 403-04 (7th Cir. 2008), quoting *Russell v. Acme-Evans, Co.,* 51 F.3d 64, 69-70 (7th Cir. 1995).

A.    Suspension

The court first addresses the causal relationship between Plaintiff's participation in the Murphy investigation and her suspension.   As an initial matter, the court would note that, as the subject of a discrimination complaint, it is logical that, if the complaint were substantiated, Plaintiff could be subject to discipline, which she was in this case (although the discrimination charges were not substantiated).  The Second Circuit, in *Deravin*, stated that its interpretation of the "participation" clause of Title VII's retaliation provision "should not be read as prohibiting employers from legitimately disciplining employees who engage in discriminatory conduct[,]" emphasizing "that Title VII only protects the specific act of participating in administrative proceedings – not the underlying conduct which is being investigated." *Deravin*, 335 F.3d at 205. "Thus, while an employer may not retaliate against an employee solely because the employee participated in a Title VII proceeding, an employer may discipline an employee if its investigation reveals culpable conduct." *Deravin*, 335 F.3d at 205.

Here, Defendants argue that Finch recommended Plaintiff be suspended based on culpable conduct revealed during the Murphy investigation in that Plaintiff violated numerous work rules.  Specifically, Finch recommended a five-day suspension, which Williams later increased to a ten-day suspension, for the following violations: her

failure to carry out the directive not to check IDs of persons at the pool; not issuing corrective discipline against Murphy for her repeated tardiness, call offs, failure to show, and leaving her job site; and retaliating against Murphy with the coaching session after Murphy filed the complaint against her.  Taken on their face, these are legitimate reasons for the meting out of discipline following an investigation.

Plaintiff, however, has provided competent evidence calling into question Defendants' explanations for the suspension.  As is to be expected, the legitimate reasons put forth by Defendants for the suspension are the exact same in the retaliation analysis as they are in the discrimination analysis, and Plaintiff's evidence demonstrating pretext is the exact same as well.  The court need not recount an identical recitation of the facts and the court's analysis.  The court would again note the relevance of Carpenter's testimony that Finch's interviews with Plaintiff were "contentious" and that Finch became "upset" with Plaintiff because she did not like the answers Plaintiff was providing, as well as Plaintiff's own testimony that Finch was "hostile" towards Plaintiff during the interviews.  Such statements or behavior demonstrating animus are relevant in determining causation.  See *Oudghiri*, 2022 WL 843869, at *9.

For the same reasons articulated in the discrimination analysis, the court finds that a reasonable factfinder, taking all evidence and reasonable inferences therefrom in the light most favorable to Plaintiff, could find that Plaintiff has demonstrated pretext. However, as with the discrimination analysis, there must be evidence from which an inference can be made that the pretext is a cover for retaliatory intent.  *Wilson v. Lear Seating Corp.*, 258 F.Supp.3d 916, 928 (S.D. Ind. 2017).  Here, there is a much more intimate connection between the protected activity and the adverse employment action

than with the position elimination retaliation claim addressed below.  Plaintiff's suspension arose directly from the complaint that was subject of the investigation in which Plaintiff participated.  Retaliatory intent can be inferred from the fact that Finch, the investigator who recommended to Williams that Plaintiff be disciplined, was "hostile" to Plaintiff during the interview and, according to Carpenter, seemed to grow upset based on Plaintiff's answers to her questions.  Taking all of this evidence in the light most favorable to Plaintiff and drawing all reasonable inferences therefrom, a factfinder could find that all of Defendants' stated reasons for the suspension were pretext, and that "a person with retaliatory animus 'provided factual information or input that may have affected the adverse employment action,'" and therefore find Defendants liable for retaliation.  See *Donley v. Stryker Sales Corp.*, 906 F.3d 635, 639 (7th Cir. 2018).

The court is mindful that, in order to survive summary judgment, there must be a genuine issue of material fact that Plaintiff's participation in the Murphy investigation was the but-for cause of her suspension, in that if she did not participate in the investigation, she would not have been suspended.  Defendants have put forth legitimate bases for her suspension.  However, Plaintiff has also put forth competent evidence that, when viewed in Plaintiff's favor and taking all reasonable inferences therefrom, could cast doubt in the mind of a reasonable factfinder on all three of Defendants' proffered reasons for the suspension and evince a retaliatory animus on the part of at least one decisionmaker with input into the ultimate decision.  Thus, summary judgment must be denied on Plaintiff's retaliation claim concerning her suspension.

B.     Position Elimination

Turning next to the elimination of her position, Defendants argue that there is no causal connection between that action and Plaintiff's participation in the investigation because: (1) the decisionmaking process that led to the elimination of Plaintiff's position began in 2018 or 2019, predating the investigation and Plaintiff's participation in it; and (2) there were legitimate, non-retaliatory reasons for eliminating Plaintiff's position, in the form of restructuring and budgetary concerns about whether Plaintiff's position was actually a full-time, year-round position, and later the impact of the COVID-19 pandemic on the demand for recreational services and activities.

Plaintiff argues that the reasoning behind her position's elimination was pretextual, because: (1) Carpenter told her on November 3, 2020, that he had not previously discussed eliminating her position with Williams; (2) Defendants did not honestly believe budget deficits necessitated her position elimination; (3) Defendants did not honestly believe Plaintiff's job was not full-time; (4) Defendants did not honestly believe the COVID-19 pandemic necessitated the elimination of her position; and (5) Defendants deviated from standard practices in making the decision to eliminate her position.

Defendants first argue that Williams and Carpenter had discussed eliminating Plaintiff's position (whether it was full-time or part-time)  for budgetary and structural reasons prior to the August 2020 Murphy investigation, pointing to discussions they had in 2019 and 2020.  Plaintiff contests this assertion, arguing that Carpenter told her on the day she learned of the adverse actions, November 3, 2020, that he and Williams had never discussed eliminating her position before that day.  However, Defendants'

62

arguments and the testimony of Williams and Carpenter are corroborated by the June 3, 2019, email from Williams to Carpenter stating:

> [Plaintiff] makes a substantial amount of money for what she does, especially in comparison to other people who make a similar amount or much less.  It was my understanding prior to the recent overtime request that I received that she would not be paid any overtime this year and that is how we were saving her job!  I am not authorizing her to be paid additional overtime in any capacity, so if we need to adjust her hours or whatever else we have to do, then that's what we need to do, but there is no way we are paying her for any further OT after what has been accumulated through today.  No one who functions in capacity as a division or department head should be receiving OT in my opinion, but especially not this position.

If anything, this email demonstrates that Williams and Carpenter were discussing concerns about Plaintiff's job position and City finances as far back as mid-2019, with Williams going so far as to state not paying Plaintiff overtime would "sav[e] her job[,]" the implication being financial concerns were imperiling the future of Plaintiff's position.  Moreover, Williams also evinced a belief that Plaintiff made a lot of money "for what she [did]," and that department heads like Plaintiff should not be receiving overtime, "but *especially* not [Plaintiff's] position."  (Emphasis added).  This further corroborates Williams and Carpenter's testimony that Williams had concerns about Plaintiff's position and the amount of work he believed Plaintiff did, or did not do, for the level of compensation she received.  Thus, any pretextual value from Carpenter's alleged statements to Plaintiff at the time he informed her of position elimination is scant.[19]

_____

[19]Moreover, taking Plaintiff's testimony in this regard for the truth of the matter asserted, it would mean, necessarily, that no discussion or decision about terminating Plaintiff's employment would have occurred until November 3, 2020, nearly two

Next, Defendants argue that Williams' budgetary concerns played a role in the decision to eliminate Plaintiff's position. Plaintiff argues this was pretextual because evidence from Danville City Council meetings and audited financial statements shows that the deficits in the required budget reserves had been extinguished well before November 2020. However, as argued by Defendants, there is no evidence that Williams had a "magic number" in mind that he wanted to achieve when reducing expenditures. Further, this evidence does not demonstrate that Williams did not honestly believe eliminating Plaintiff's position would aid the City's financial reserves. Williams may have been inaccurate, incorrect, foolish, or even baseless, but the question for prextext is not whether Williams' reasons for a decision are right, but whether Williams' description of his reasons is honest. See *Brooks v. Avancez*, 39 F.4th 424, 436 (7th Cir. 2022).

Even if the deficit reserves evidence did support a circumstantial case undermining Williams' explanation for the adverse employment action, Plaintiff still needs to produce evidence supporting a rational inference that retaliation for participating in the investigation was the true cause of her position elimination, which she has not done. See *Merrick v. Hilton Worldwide, Inc.*, 867 F.3d 1139, 1150 (9th Cir. 2017) (defendant's failure to achieve the required payroll reduction could call into question the credibility of one of its proffered reasons for the plaintiff's termination, yet

---

months after Plaintiff's protected activity. Without more, this seven-week gap is too long a time to support an inference of retaliation as the Seventh Circuit has held that it "'typically allows no more than a few days to elapse between the protected activity and the adverse action.'" *Khungar*, 985 F.3d at 578, quoting *Kidwell v. Eisenhauer*, 679 F.3d 957, 966–67 (7th Cir. 2012) (concluding that five week lapse alone does not support inference of causation).

such evidence may still be insufficient to create a triable issue for a jury, because there must be evidence supporting a rational inference that intentional discrimination, on grounds prohibited by the statute, was the true cause of the employer's actions).

In conjunction, and likely overlapping with, the budgetary concerns, Defendants argue that Plaintiff's position was not full-time by 2019, and certainly not in 2020 at the time of its elimination due to the COVID-19 pandemic.  Plaintiff responds that this reason is pretextual, because Williams did not know the specific work she performed, as the only information he had came from Carpenter, who was newly installed as director and did not understand the specifics of Plaintiff's job, and Williams undertook no effort on his own to investigate her work.  Plaintiff also points to a list that Williams said he ordered Plaintiff to create for him, listing her job duties for Williams' review, that Defendants could not produce in discovery.   Plaintiff also cites to her own testimony and that of numerous others that, during the substantial time they worked for the City and supervised Plaintiff, no one ever suggested her position was not full-time or was only seasonal, and that, prior to November 3, 2020, none of them had heard any talk about Williams eliminating Plaintiff's position.

Again, the evidence submitted by Plaintiff does not, for the most part, go to whether Williams honestly believed Plaintiff's position was not actually full-time, but rather whether his belief in that respect was accurate or baseless, which is not evidence of pretext.  If Defendants honestly believed their reasons for taking the challenged actions, even if those reasons were incorrect, then the reasons were not pretextual.  See *Brooks*, 39 F.4th at 435.  In determining whether Defendants' reasons can be characterized as pretextual, the court does not evaluate whether the proffered

justifications are accurate or even whether they were unfair; rather, the sole focus is on whether Defendants' stated reasons can be characterized as falsehoods rather than honestly held beliefs. *Brooks*, 39 F.4th at 435; see also *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 418 (7th Cir. 2006) ("[T]he question is never whether the employer was mistaken, cruel, unethical, out of his head, or downright irrational in taking the action for the stated reason, but simply whether the stated reason was his reason: not a good reason, but the true reason."). Because courts are not super-personnel departments who sit in judgment of management decisions, it is of no moment if the employer's reasoning is incorrect, foolish, trivial, or even baseless. *Brooks*, 39 F.4th at 436. Arguing about the accuracy of the employer's assessment is a distraction because the question is not whether the employer's reasons for a decision are right but whether the employer's description of its reasons is honest. *Brooks*, 39 F.4th at 436.

The failure of Defendants to produce the list does, to a certain extent, undercut Williams' credibility in his testimony about his knowledge of Plaintiff's duties, but this is a minor point, and when arrayed against the rest of the evidence, is not nearly enough to establish pretext such that a desire to retaliate against Plaintiff for participating in the Murphy investigation was the reason for her position elimination, even when considered with evidence such as the City's finances and whether Carpenter believed Plaintiff's position should be eliminated.

As for the other witnesses' testimony or declarations about Plaintiff's work performance and her work being full-time and not seasonal, when it comes to pretext, the evidence is what the *decisionmakers* knew and believed, not non-decisionmakers like Ahrens, Davis, or Schnelle. See *Downing v. Abbot Laboratories*, 48 F.4th 793, 805 (7th Cir.

2022).  Moreover, Plaintiff's past performance and job evaluations are largely irrelevant

to the analysis, as "past positive evaluations do not guarantee future employment."  See

*Igasaki*, 988 F.3d at 959.   Regarding the statements of former mayor Eisenhauer, he had

not been in that position since 2018, and the relevant decisionmaker here is Williams,

and the relevant time period at issue is 2018/19 to 2020, and thus Eisenhauer's

statements on Plaintiff's position during his time in office are not entirely relevant.  See

*Davis v. Harris*, 2006 WL 3321630, at *38 (C.D. Ill. Nov. 14, 2006) ("The current

administration is not relevant to the time frame. The issue is the custom, policy and

practices of the Department from 1996 to 2002. Thus, the evidence about the current

administration's efforts, or the lack thereof, is not relevant to this case.") (internal

citation omitted).  Finally, Williams was not required to share his reasons for

eliminating Plaintiff's position with his subordinates or past members of City

administration.  See *Stieglitz v. City of Chicago*, 2022 WL 2702167, at *3 (7th Cir. July 12,

2022) ("But Clay was not required to share his reasoning with his subordinate, and his

decision not to do so does not demonstrate that his reason is false.").  This evidence

does not suggest that Defendants' stated reasons were a pretext for retaliation.

　　　Next, Plaintiff argues that a factfinder could infer pretext from Eisenhauer's

declaration that COVID-19 should not lead to the closure of the municipal pool, and

from Carpenter's testimony that the engineering report did not state or suggest that the

pool was not operational.  First, Eisenhauer is no longer the mayor of Danville, and

what one municipality or governmental unit closes or keeps open in response to the

COVID-19 pandemic may not be the same policy adopted by a different municipality.

The variety in responses to the COVID-19 pandemic across governmental units in this

country was on full display from 2020 to 2022.  There was no one-size-fits-all

governmental response to COVID-19.  Some governments were more strict in their

closures, others were more open.  Carpenter did testify that the engineering evaluation

for the pool did not provide an opinion that the pool was not operational or should not

be opened, but, after receiving the evaluation, Carpenter's own inspection found

various problems, such as the guttering being in such poor condition that the pool was

not safe to use.  The court finds this evidence does not demonstrate pretext.

Finally, Plaintiff argues that Williams' deviation from standard City policy in

eliminating her position is evidence of pretext.  The Seventh Circuit "has held in the

past that an employer's failure to follow its own internal employment procedures can

constitute evidence of pretext."  *Rudin v. Lincoln Land Community College*, 420 F.3d 712,

727 (7th Cir. 2005).  "However, there must be evidence of a specific policy that is

regularly enforced and followed in similar situations."  *Bagwe*, 811 F.3d at 882.

Whatever Williams' policy when it came to eliminating a position, it was not a

formal, written policy.  Plaintiff has produced no evidence that Williams had a formal,

written policy in place or specific procedures that he followed with respect to discipline

and termination.  If anything, based on Williams' deposition testimony cited by

Plaintiff, his "policy" seemed informal and ad hoc.  Still, whether a policy is formal or

informal, written or unwritten, it can still be a "policy" for pretext analysis purposes if it

is regularly enforced and followed in similar situations.  See *Osicka v. Sears, Roebuck &*

*Co.*, 886 F.Supp. 1408, 1415 (N.D. Ill. 1995) ("However, quite apart from the existence or

not of a formal policy it is clear that the relevant decision makers followed an informal

practice of preferring active employees.").

However, as noted by Defendants, there did not seem to be any official policy, or practice by Williams, that obligated him to eliminate the position in the manner described by Eisenhauer or Davis.  See *Hague v. Thompson Distribution Co.*, 436 F.3d 816, 828 (7th Cir. 2006), citing *Rand v. CF Industries, Inc.*, 42 F.3d 1139, 1145 (7th Cir. 1994) (holding that since the employer's policy did not obligate the employer to communicate problems, the failure to do so does not constitute evidence of pretext).  The way that Eisenhauer conducted City business in the past may not be the same way that Williams conducted business.

Considering the evidence as a whole, the court finds the record does not contain sufficient evidence to permit a reasonable factfinder to conclude that retaliatory motive caused Plaintiff's position to be eliminated.  See *Abrego*, 907 F.3d at 1014.  As a practical matter, the elimination of Plaintiff's position is much more attenuated from the Murphy investigation than her suspension, which was a direct consequence of the investigation and, arguably, Plaintiff's participation in it.  Here, the evidence demonstrates that discussions between Williams and Carpenter about the future and possible elimination of Plaintiff's position had been in the works since at least 2019, long before the Murphy investigation.  Moreover, there is very little evidence of direct animus between Williams and Carpenter on one hand and Plaintiff on the other as a result of the investigation, compared with Finch where Plaintiff and Carpenter testified to the contentious nature of the investigatory interviews.

Much of the evidence cited to by Plaintiff falls short of demonstrating pretext.  Rather, the evidence may support an argument that Williams and Carpenter's decision to eliminate her position was baseless, based on an inaccurate or uninformed

assessment of her job duties or the budget, or was carried out in a manner that deviated from the practice of past administrations, but that does not constitute evidence that Defendants were lying about their reasons for eliminating Plaintiff's position. See *Brooks*, 39 F.4th at 436.

Plaintiff has produced some evidence that could be considered evidence of pretext, such as Carpenter's statement to her that he did not agree with Williams' decision, despite signing the position elimination order and testimony that it was a joint decision, and evidence about deviation from past practice, slight though it may be. Defendants have offered multiple non-retaliatory grounds for the elimination of her position (budgetary, seasonal nature, COVID-19), and Plaintiff's scattered evidence of pretext, is insufficient to demonstrate a genuine issue of material fact that her participation in the Murphy investigation was the reason her position was eliminated. See *Fischer*, 519 F.3d at 403-04. It must also be remembered that, unlike with discrimination under Title VII, for retaliation the impermissible reason must be more than just a motivating factor in the adverse action; it must be *the* factor motivating the adverse action. Unlike with the suspension, Plaintiff's pretextual evidence concerning her position elimination does not undermine every one of Defendants' proffered legitimate, non-retaliatory grounds. Further, while Plaintiff's hostility with Finch was directly tied to her role in the Murphy investigation and Finch recommended discipline for Plaintiff as a result of that investigation, Finch had nothing to do with the elimination of Plaintiff's position. Plaintiff's evidence may lead to an inference that she was a disfavored employee and that Williams wanted to penalize her and ultimately get rid of her, but even if she was disfavored for personality or other reasons or if Williams

was determined to eliminate the position of superintendent of recreation, so long as those reasons are independent of any retaliatory animus over her participation in the Murphy investigation, her Title VII retaliation claim on this ground must fail.  See *Jackson*, 2022 WL 3009598, at *5.  Summary judgment is granted in Defendants' favor on this ground.

V.    *Qualified Immunity*

The only remaining claim in this case is Plaintiff's Title VII retaliation claim regarding her suspension, and qualified immunity is not recognized as an affirmative defense to Title VII claims.  See *Rosas v. Board of Education of the City of Chicago*, 2023 WL 415183, at *13 (N.D. Ill. Jan. 25, 2023) ("BOE does not identify any case that recognizes qualified immunity as a viable affirmative defense to Title VI or Title VII claims, the only claims that Plaintiff brings against BOE. Thus, the Court strikes Affirmative Defense 8.").  Therefore summary judgment is denied on qualified immunity grounds.

IT IS THEREFORE ORDERED:

(1)    Defendants' Motion for Summary Judgment (#29) is GRANTED in part and DENIED in part.  It is DENIED as to Plaintiff's Title VII and IHRA retaliation claims regarding her suspension, in Counts IV and VI, respectively.  It is GRANTED in all other respects.

(2)    This case is set for a telephone status conference on Friday, April 21, 2023, at 1:15 pm, to set final pretrial and jury trial dates.  The parties are to call 551-285-1373, and then enter meeting ID# 16051789866.

ENTERED this <u>21st</u> day of <u>March</u>, 2023.


s/ COLIN S. BRUCE
U.S. DISTRICT JUDGE